[No. D041791. Fourth Dist., Div. One. Nov. 12, 2003.]

J. P. MORGAN & CO., INCORPORATED et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
HELIOTROPE GENERAL, INC. et al., Real Parties in Interest.

196

198

COUNSEL

Davis, Polk & Wardwell, James H. R. Windels, Amelia T. R. Starr; Irell & Manella, Alexander F. Wiles, Gregory R. Smith, Peter T. Christensen; Simpson, Thacher & Bartlett, Peter C. Thomas and Seth A. Ribner for Petitioners.

Krause & Kalfayan, James C. Krause and Eric J. Benink for Real Parties in Interest.

## OPINION

**HUFFMAN, Acting P. J.**—The trial court certified this Cartwright Act case as a class action involving class members who are residents of 18 different states. (Bus. & Prof. Code, § 16700 et seq.)[1] The moving party plaintiff was Heliotrope General, Inc. (Heliotrope or plaintiff), a large-scale copper purchaser. Both this action and a companion action (*National Metals, Inc. v. Sumitomo et al.* (D041783, app. pending) (the companion action)) were brought by such copper purchasers against numerous defendants (as pertinent here, defendants and petitioners herein J. P. Morgan & Co., Incorporated et al. (J. P. Morgan).)[2] Plaintiff's theory is that these defendants have manipulated the price of copper on the London Metals Exchange (LME) and on the American copper futures exchange, COMEX, through combinations in restraint of trade in violation of the Cartwright Act and through conspiracies to do so, to the detriment of copper purchasers in their private transactions on the physical or cash copper markets, as represented by the putative class representatives.

Petitioners J. P. Morgan contend the trial court made an incomplete and erroneous analysis of the factors relevant to certification. We agree and conclude the certification order must be vacated, as the record does not support a finding of sufficient community of interest among the putative class members, in light of certain conflicts of interest among them. Also, the record does not demonstrate the required predominating common questions of law and fact regarding proof of fact of any classwide injury, nor that the rules regarding conflicts of laws considerations were properly applied here.

---

[1] All further statutory references are to the Business and Professions Code unless noted. Section 16720 defines an unlawful trust as, inter alia, "a combination of capital, skill or acts by two or more persons for any of the following purposes: (a) To create or carry out restrictions in trade or commerce. (b) To limit or reduce the production, or increase the price of merchandise or of any commodity. (c) To prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity. . . ."

[2] We will refer collectively to the petitioners and defendant J. P. Morgan, Morgan Guaranty Trust Company of New York, and Chase Manhattan Bank as J. P. Morgan. Plaintiff alleges J. P. Morgan et al. are financiers that participated in the alleged restraint of trade in the copper market.

In the companion action, *National Metals*, there are also pending writ proceedings in this court, brought by Global Minerals and Metals Corporation (GMMC) to challenge the same class certification order. (*National Metals, Inc. v. Sumitomo et al.*, D041783.) GMMC is a copper merchant company, and it has settled this *Heliotrope* action. However, GMMC joins in the J. P. Morgan arguments. Also, J. P. Morgan joins in the GMMC arguments in that writ matter. Where necessary, we will discuss these two companion writ petitions together; they have not been consolidated.

## BACKGROUND

### A

#### THE COPPER TRADING INDUSTRY AND EARLIER RELATED ACTION

In 1996, Heliotrope, a purchaser of physical copper, brought its original class action complaint on allegations of price-fixing and antitrust violations in the copper market, similar to the allegations in the present action. (*Heliotrope v. Sumitomo et al.* (Super. Ct. San Diego County, 1996, No. 701679) (the prior action).) This prior action was heavily litigated and on October 10, 1997, Superior Court Judge Arthur Jones denied certification of a proposed class that was similar to this one, without prejudice. At that time, the court found that the proposed class was "unmanageable due to the degree of complexity in applying the laws of nineteen different states." Judge Jones retired and these related actions were assigned to Judge J. Michael Bollman.

The present action was filed June 6, 2000 by Heliotrope as a class action for antitrust violations against a number of different defendants, including J. P. Morgan and its related defendants. (*Heliotrope General Inc. v. Credit Lyonnais Rouse, Ltd. et al.* (Super. Ct. San Diego County, 1996, No. GIC749280).) It follows up on the original *Heliotrope* action but has a different class definition and more defendants. A number of defendants have settled this *Heliotrope* action, including GMMC, leaving J. P. Morgan and the related defendants as the only petitioners in this writ proceeding.

The prior *Heliotrope* action, as well as a related local action and others in different jurisdictions, were settled and Sumitomo and other defendants, such as Merrill Lynch, paid millions of dollars into a settlement fund, on which claims were made by various consumers of copper product and scrap/recycled copper product.[3] Plaintiff's counsel represented to the trial court the settlement amounts exceed $75 million; in the opposition brief, it is stated five settlements have been reached, amounting to $83 million. Those background facts are argued for their relevancy to the class definition issue.

As already referenced, there is a companion action in which companion writ proceedings have been filed, *National Metals, Inc. v. Sumitomo et al.* National Metals filed that action after its claim on the settlement funds in the earlier actions was denied. GMMC remains a defendant in that action and

---

[3] The prior action, No. 701679, and a related action, No. 701680 (*R. W. Strang Mechanical v. Sumitomo Corporation et al.*), resulted in large settlements by Sumitomo and Merrill Lynch (approximately $31 million). There were 2,429 approved claims for copper product purchases and 712 for scrap/recycled copper purchases. A related federal action was settled and was administered by the same claims administrator.

J. P. Morgan and its two related defendants remain as parties defendant in both actions. (See fn. 2, *ante.*) Numerous other defendants have settled in that action.

Essentially, the plaintiff in the current *Heliotrope* action seeks to represent purchasers of copper product that is not scrap or recycled (the CP Class), while the plaintiff in the companion *National Metals* case seeks to represent purchasers of scrap or recycled copper product (the SCP Class). In all these actions, the subject purchases are alleged to have taken place between January 1, 1993 and May 31, 1996 (the class period). The proposed class of plaintiffs consists of businesses and individuals who are active purchasers of copper products (see pt. B below), and who are residents of one of the 18 states, as defined in the motion as recognizing indirect purchaser standing to sue for antitrust damages, in this proposed multistate class action.[4]

As described in the petition, the proposed class is alleging a antitrust conspiracy to inflate the price of physical copper over a three-year period. Their causation theory consists of the following: (1) defendants conspired to manipulate the LME, causing an artificial inflation of prices; (2) this artificial inflation of prices on the LME caused an artificial inflation of prices upon the COMEX; (3) this artificial inflation of futures prices upon the COMEX caused an artificial inflation of prices in the various physical and scrap copper markets around the United States; (4) such that class members were injured when they paid artificially inflated prices for physical copper.

B

THE MOTION AND OPPOSITION

In their motions in both of these companion actions, plaintiffs sought an order naming two classes of copper purchasers defined as follows: "All persons or entities who, between June 1, 1993 and May 31, 1996 inclusive, purchased any Copper Product [5] (as defined below) for use in any trade or business or for resale (and not for personal use), and who at the time of such

---

[4] The 18 states of residence of the proposed class members are designated by the term "included states" as meaning California, Alabama, Arizona, the District of Columbia, Florida, Kansas, Louisiana, Maine, Michigan, Mississippi, New Jersey, New Mexico, North Carolina, North Dakota, South Dakota, Tennessee, West Virginia and Wisconsin.

[5] As used in the moving papers: " 'Copper Product' means any of the following copper products: (i) smelter and refinery feed and output, including, but not limited to, copper concentrate, matte, blister and anode, cathode, continuous cast rod, wire bar, ingot, billet, and cake; copper wire mill fabricated items, including, but not limited to, copper wire and cable, bar and insulated copper wire, magnet wire and power cable; copper mill fabricated products, including but not limited to, sheet, strip, coil and extruded shapes, plumbing tube, thin wall

purchase (1) resided in any of the Included States[6] (as defined below); (2) purchased any Copper Product from a Person who was a resident of any Included State; or (3) purchased any Copper Product for delivery in any Included State (the 'CP Class');" and "all persons or entities who, between June 1, 1993 and May 31, 1996 inclusive, purchased any Scrap or Recycled Copper Product[7] (as defined below) for use in any trade or business or for resale (and not for personal use) and who at the time of such purchase (1) resided in any of the Included States (as defined below); (2) purchased any Scrap or Recycled Copper Product from a Person who was a resident of any Included State; or (3) purchased any Scrap or Recycled Copper Product for delivery in any Included State (the 'SCP Class')."[8]

Plaintiffs' motions were made on the grounds that these two classes were sufficiently ascertainable, and there was a well defined community of interest in questions of law and fact among the members of the two classes. Plaintiffs argued that certifying the cases as class actions was a manageable and efficient way of proceeding with this action. Heliotrope was the proposed representative of the CP Class, and National Metals was the proposed representative of the SCP Class. Both motions defined and requested certification of both classes, but it is not disputed that Heliotrope is primarily representing copper product purchasers, while National Metals is primarily representing scrap and recycled copper product dealers.

In addition, plaintiffs argued that certifying the cases as class actions was appropriate, because the classes were so large that joinder of all class members was impracticable. Specifically, plaintiffs contended that based on the information gained in the previous settlements, there were at least 2,429 members of the copper products class (*Heliotrope* action) and at least 712 members of the scrap and recycled copper products class identified to date

---

tube, foil, sections, pipes, slabs, plates, fittings, forgings or powder consisting of refined copper or high copper alloys; or (ii) any product consisting of a copper content of 80 % or more."

[6] See footnote 4, *ante*.

[7] As used in the moving papers: " 'Scrap or Recycled Copper Product' means any of the following scrap or recycled copper products: (i) smelter and refinery feed and output, including, but not limited to, copper concentrate, matte, blister and anode, cathode, continuous cast rod, wire bar, ingot, billet, and cake; copper wire mill fabricated items, including, but not limited to, copper wire and cable, bar and insulated copper wire, magnet wire and power cable; copper mill fabricated products, including but not limited to, sheet, strip, coil and extruded shapes, plumbing tube, thin wall tube, foil, sections, pipes, slabs, plates, fittings, forgings or powder consisting of refined copper or high copper alloys; or (ii) any product consisting of a copper content of 80 % or more."

[8] As stated in the moving papers: "Excluded from the Copper Product Class and Scrap or Recycled Copper Product Class are all Defendants and any subsidiary, affiliate, or current or former officer, director or employee of Defendants and any government entity."

(*National Metals* action). Additionally, there was evidence of thousands of additional members of both classes who had yet to be identified.

Further, plaintiffs argued there were questions of law or fact common to each member of the classes, and these common questions predominated over any questions affecting only individual members of the classes, such that class action status was a superior method of adjudicating the controversy. Plaintiffs contended they were proper representative plaintiffs.

In support of the motions, plaintiffs submitted expert evidence from three principal witnesses. Plaintiffs' expert economist and professor of finance Dr. Alex Kane rendered his opinion that a common impact on each member of the proposed copper product class can be demonstrated by showing, through data analysis and certain assumptions, that as a result of defendants' manipulation of the copper markets, those purchasers were charged supracompetitive prices for copper products, and the amount of damages is susceptible to common proof. He submitted both a declaration and an extensive report projecting multimillion dollar damages.

Next, plaintiffs submitted evidence from Dennis Gilardi, the claims administrator of the previously settled matters, stating that based on his experience in the related cases, the class members are identifiable and manageable. Gilardi had taken in claim forms, built a database of the information and processed that information according to the terms of the settlement, involving billions of dollars' worth of claims. There were 2,429 members of the copper products class in the settled matters, with submitted claims reflecting a total purchase amount by the class of $20 billion in copper products. In the related settlement matter, regarding the scrap and recycled copper products class, there were 712 claims made by class members, reflecting purchases of scrap and recycled copper products in the amount of $8.8 billion.

Next, plaintiffs' expert Andrew Novak opined that a notification program can be designed and implemented to reach members of the copper product class and the scrap copper product class.

In their reply papers, plaintiffs relied on a prior ruling issued by the trial court in the *National Metals* case, denying an individualized summary judgment motion by defendant GMMC. There, the trial court had found in July 2002 that there were triable issues of fact as to several issues: Whether there were sufficient contacts of the plaintiff, National Metals, with California to justify the application of California antitrust law, and whether the damages allegedly sustained by National Metals in dealing with GMMC should be measured by the final price paid for the scrap copper, or by the overpayment of the copper component of that price stemming from antitrust violations. In

that summary judgment ruling, the trial court found that damages could reasonably be calculated by determining the amount of copper in the scrap purchased by that plaintiff, and there remained triable issues of fact about whether all of the increases in the price of the copper were passed on to customers of that plaintiff.

Extensive opposition was filed by defendants to both class certification motions, chiefly arguing that the proposed classes were overbroad and unascertainable, and there were inherent and unavoidable conflicts among the proposed class members. This was due to the complex nature of the copper marketing business, in which various participants acted at various times as buyers or sellers. According to J. P. Morgan, there are at least eight levels of distribution and consumption of nonscrap/recycled copper products, including manufacturers, scrap dealers, refiners, fabricators and semifabricators, wholesalers, traders, and retailers. There is a multitiered vertical and horizontal chain of distribution, and various copper purchasers combine one or more levels of the distribution network in their operations. Discovery conducted from putative class members showed that when copper is purchased, individually negotiated contracts may be affected by various factors, such as the identity of the supplier, product, and transaction, the size and timing of the purchase, payment, and delivery, and additional costs such as labor, handling, and transportation. Prices paid on the physical or cash copper markets are affected by these factors, as well as by the futures prices established on the LME and COMEX. Also, copper purchasers used various forms of price protections, such as hedging, to avoid exposure to market price fluctuations.

Additionally, defendants argued there were material conflicts of law among the included states from which the putative class members would be drawn, so as to present problems that would preclude litigation in the form of a multistate class action. Defendants also strenuously argued that it was not possible to use classwide common proof or mathematical techniques to establish whether the alleged price manipulation on the LME and then on the COMEX resulted in higher prices paid by individual class members, but rather that individual analysis will be required for each proposed class member. Such individual analyses of causation, injury, and damages were argued to indicate that the court lacked the ability to certify the class. Reply papers were filed and oral argument held.

C

ORDER AFTER HEARING ON MOTIONS FOR CLASS CERTIFICATION

The trial court granted plaintiffs' motions for class certification. (Code Civ. Proc., § 382.) The court found the current class definition was sufficiently

precise so that the class was ascertainable and manageable and therefore, California law may be properly applied, as follows: "The present class definition is restricted to the purchasers of copper products with more than 80 percent copper and certain enumerated products."[9]

With respect to plaintiffs' burden to identify the potential class members, the court found the three experts' declarations adequately showed that the class is ascertainable, manageable, and notice can properly be given to the proposed class members. Discussing the evidence from Dennis Gilardi, the claims administrator, the trial court stated that it was a significant fact "that thousands of claims based upon the definition of copper products substantially similar to this proposed definition have been effectively processed without objection. The fact that some claims may have slipped through the administrative process should not defeat the proposed definition of class products."

With respect to the economist, Dr. Kane's, evidence, the trial court noted that it was not disputed that Dr. Kane had assumed causation of injury for purposes of his analysis. The trial court found it significant that at Dr. Kane's deposition, the defendants did not provide Dr. Kane with a definition of causation. Accordingly, the trial court found, "Dr. Kane's report reflects that if plaintiff proves the conspiracy caused a rise in the LME price of copper, then it follows that this illegal activity caused a price increase to the purchasers of copper products. The report indicates there is a correlation between manipulations and resulting damages. . . . 'Copper prices on the LME and COMEX move, unambiguously, in near-perfect lock step.' . . . This is sufficient to show causation." It was also found significant that Plaintiffs' expert Novak opined that notice could be adequately provided to putative class members.

Regarding the defense evidence presented, the trial court found unpersuasive defendants' argument that copper products are extremely varied in nature and there are substantial differences in the factors affecting buying and selling. The court found such challenges go to the weight of the evidence, which should be resolved at trial, rather than a motion to certify the class, and stated, "Although a trial court must conduct rigorous analysis to ensure that the prerequisites of class certification is met [sic], a motion for class certification is not an occasion for examination of the merits of the case and the court should not delve into the merits of an expert's opinion. [Citation.]"

---

[9] This conclusion by the trial court reflects the alternative definitions provided for in the class of copper product purchasers, of which the 80 percent copper content product is one, and the listed products are another. Please see footnote 5, *ante*. However, this copper products class was also referred to at the trial court hearing as the "pure copper" or "refined copper" class, as contrasted to the scrap/recycled class.

Further, the trial court rejected defendants' argument there were variations in the laws between California and the additional included states that were so complex as to render the proposed classes unmanageable. The trial court reasoned, "As set forth in this court's final ruling of September 3, 2002, regarding defendant [GMMC] Global's motion for summary judgment, Global had significant contacts with California involving its employees that controlled and supervised $50 million in copper warrants and 20,000 metric tons of copper shipments to and from the London Metals Exchange ('LME') licensed warehouse located in Long Beach, California. Global participated, traveled to, and negotiated a significant number of complex transactions that involved ties to California. Even considering the limited period of time after this warehouse opened in 1995, with respect to the 6/1/93–5/31/96 time period of the class definition, the court found those contacts significant, and ruled that applying California choice of law provisions was neither arbitrary of unfair. [Citation.] . . . Plaintiff's causes of action are based upon conspiracy. The court's reasoning on Global's motion for summary judgment applies equally here. California law may be applied and since there is no state that has a greater interest in having its laws applied, there is no undue complexity and no conflict of laws."

The trial court further found that plaintiffs had successfully established that the number of members is so large that joinder is impractical, and there was a sufficient "community of interest due to common questions of fact and law which predominate, including 1) whether defendants have manipulated the price of copper on the LME and COMEX through combinations in restraint of trade in violation of the Cartwright Act; 2) whether defendants conspired to manipulate the price of copper on the LME and COMEX to the detriment of copper purchasers represented by the class action (fact of injury or causation in an antitrust case is a common issue that predominates over individual claims); and 3) whether damages may be awarded based on a defendant's aggregate overcharge without proof that each class member was overcharged. The need for individual calculation of damages does not preclude class certification. Where illegal horizontal price fixing combinations are alleged, questions of law or fact predominate over questions affecting only individual members. [Citation.]"

The trial court further found that plaintiffs' claims were typical of the claims of the class, and plaintiffs would fairly and adequately represent the class, and current counsel would be appointed to represent the class. Accordingly, in both related actions, the court granted Plaintiffs' motions to certify the class. Defendants brought this petition to challenge the ruling.

## DISCUSSION

### I

### CLASS CERTIFICATION STANDARDS

### A

### GENERAL CLASS ACTION RULES

" 'Section 382 of the Code of Civil Procedure authorizes class suits in California when "the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court." The burden is on the party seeking certification to establish the existence of both an ascertainable class and a well-defined community of interest among the class members. [Citation.]' " (*Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, 1103–1104 [131 Cal.Rptr.2d 1, 63 P.3d 913] (*Lockheed Martin*).)

As outlined in *Lockheed Martin*, the class certification question is " 'essentially a procedural one that does not ask whether an action is legally or factually meritorious.' [Citation.] 'The community of interest requirement [for class certification] embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class.' [Citation.] Plaintiffs acknowledge it is their burden to establish the requisite community of interest and that 'the proponent of certification must show, inter alia, that questions of law or fact common to the class predominate over the questions affecting the individual members.' [Citation.]" (*Lockheed Martin, supra*, 29 Cal.4th at p. 1104.)

When a plaintiff is seeking to show the requisite community of interest for class action treatment, some inquiry into the merits of that particular issue must be made, even though in general, the class certification question is " 'essentially a procedural one.' " (*Lockheed Martin, supra*, 29 Cal.4th at p. 1104.) " '[T]he issue of community of interest is determined on the merits and the plaintiff must establish the community as a matter of fact.' [Citation.] A ' ". . . class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.' " ' [Citations.] In sum, the fact some evidence relevant to a class action determination may have been relevant also to the merits of the lawsuit did not preclude the court from considering such evidence at the hearing on [the plaintiffs'] motion for class certification." (*Caro v. Procter & Gamble Co.* (1993) 18 Cal.App.4th 644, 656 [22 Cal.Rptr.2d 419].).)

## B

### RULES REGARDING CONFLICT OF LAW IN THE CLASS ACTION CONTEXT

Where, as here, an issue is raised regarding conflict of laws due to the presence of putative class members from different states of residency, the test set out in *Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906 [103 Cal.Rptr.2d 320, 15 P.3d 1071] (*Washington Mutual*) will be applied. "California follows a three-step 'governmental interest analysis' to address conflict of laws claims and ascertain the most appropriate law applicable to the issues where there is no effective choice-of-law agreement. [Citations.]" (*Id.* at p. 919.) These considerations apply: "Under the first step of the governmental interest approach, the foreign law proponent must identify the applicable rule of law in each potentially concerned state and must show it materially differs from the law of California. The fact that two or more states are involved does not in itself indicate there is a conflict of laws problem. [Citation.] Indeed, if the relevant laws of each state are identical, there is no problem and the trial court may find California law applicable to class claims. [Citations.] [¶] *If, however, the trial court finds the laws are materially different, it must proceed to the second step and determine what interest, if any, each state has in having its own law applied to the case. [Citation.] Despite materially different laws, 'there is still no problem in choosing the applicable rule of law where only one of the states has an interest in having its law applied.'* [Citation.] This means the trial court may properly find California law applicable without proceeding to the third step in the analysis if the foreign law proponent fails to identify any actual conflict or to establish the other state's interest in having its own law applied. [Citations.] [¶] Only if the trial court determines that the laws are materially different *and* that each state has an interest in having its own law applied, thus reflecting an actual conflict, must the court take the final step and select the law of the state whose interests would be 'more impaired' if its law were not applied. [Citations.] In making this comparative impairment analysis, the trial court must determine 'the relative commitment of the respective states to the laws involved' and consider 'the history and current status of the states' laws' and 'the function and purpose of those laws.' [Citation.]" (*Id.* at pp. 919–920, first italics added.)

When these rules come into play in a class certification motion, "a separate conflict of laws inquiry must be made with respect to each issue in the case." (*Washington Mutual, supra,* 24 Cal.4th at pp. 919–920 [e.g., where there are different theories of recovery, such as tort or contract, or indemnity/contribution problems arise]; *Beech Aircraft Corp. v. Superior Court* (1976) 61 Cal.App.3d 501, 518 [132 Cal.Rptr. 541].)

## C

### APPELLATE REVIEW OF CERTIFICATION ORDER

" 'Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification.' [Citation.] Nevertheless, 'we must examine the trial court's reasons for [granting] class certification.' [Citations.] In particular, we must consider whether the record contains substantial evidence to support the trial court's predominance finding, as a certification ruling not supported by substantial evidence cannot stand. [Citation.]" (*Lockheed Martin, supra,* 29 Cal.4th at p. 1106.) However, an order certifying a class can be found defective even where there may be substantial evidence to support it, because " 'an order based upon improper criteria or incorrect assumptions calls for reversal.' " (*Washington Mutual, supra,* 24 Cal.4th at p. 914.)

■  Accordingly, a plaintiff's burden on moving for class certification requires a showing that common issues exist, and also that substantial evidence exists to show that these common issues predominate. (*Washington Mutual, supra,* 24 Cal.4th at p. 913.) " '[T]his means "each member must not be required to individually litigate numerous and substantial questions to determine his [or her] right to recover following the class judgment; and the issues which may be jointly tried, when compared with those requiring separate adjudication, must be sufficiently numerous and substantial to make the class action advantageous to the judicial process and to the litigants." ' [Citation.]" (*Lockheed Martin, supra,* 29 Cal.4th at p. 1108.)

■  Further, in *Washington Mutual, supra,* 24 Cal.4th at pages 928 to 929, the court noted that determinations regarding the applicable law chiefly affect the issues of predominance of common issues and manageability. Conflict of laws issues also affect the community of interest requirement for multistate class certification in other ways, such as "whether the representative plaintiffs have claims or defenses typical of those of the class or whether the representative plaintiffs can fairly and adequately protect the interests of the entire class. On a final note, we caution trial courts that determinations of predominance and manageability may vary case by case, depending upon individual factors such as the number and nature of the legal theories and evidentiary issues presented in the case, as well as the size and scope of the proposed class." (*Ibid.*)

## II

### ANALYSIS OF ORDER GRANTING CLASS CERTIFICATION

As already stated, the class action proponent will bear the burden of establishing the propriety of class certification, and this burden primarily

requires a demonstration of predominance of common issues of law and fact, and manageability of the proposed class. (*Washington Mutual, supra,* 24 Cal.4th at p. 922.) Both J. P. Morgan here and GMMC, in the companion writ proceeding, seek to show the trial court erred in analyzing a major issue concerning the identity of the proposed class members, i.e., whether they have significant conflicts of interest that would interfere with class certification. We address this issue first (pt. II.A), and then turn to the other major argument raised by both J. P. Morgan and GMMC, concerning the problems of proof of fact of injury, and whether any classwide injury can be demonstrated, for purposes of review of the class certification order. (Pt. II.B, *post.*)

Finally, we will focus on the argument J. P. Morgan raises in its petition concerning whether there are serious choice of law problems. (Pt. II.C, *post.*)

A

CONFLICTS OF INTEREST MAY INTERFERE WITH CLASS CERTIFICATION

In order to be deemed an adequate class representative, the class action proponent must show it has claims or defenses that are typical of the class, and it can adequately represent the class. This is part of the community of interest requirement. (*Lockheed Martin, supra,* 29 Cal.4th at p. 1104.) Where there is a conflict that goes to the " 'very subject matter of the litigation,' " it will defeat a party's claim of class representative status. (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470 [174 Cal.Rptr. 515, 629 P.2d 23].) Thus, a finding of adequate representation will not be appropriate if the proposed class representative's interests are antagonistic to the remainder of the class. (*In re Seagate Tech. II Securities Litigation* (N.D. Cal 1994) 843 F.Supp. 1341, 1346–1347.) "The adequacy inquiry . . . serves to uncover conflicts of interest between named parties and the class they seek to represent." (*Amchem Products, Inc. v. Windsor* (1997) 521 U.S. 591, 625 [138 L.Ed.2d 689, 117 S.Ct. 2231].) " '[A] class representative must be part of the class and "possess the same interest and suffer the same injury" as the class members.' [Citations.] To assure 'adequate' representation, the class representative's personal claim must not be inconsistent with the claims of other members of the class. [Citation.]" (*In re Beer Distribution Antitrust Litigation* (1998) 188 F.R.D. 549, 554.) In that case, a showing of intra-class conflicts among a proposed class of plaintiff custom beer brewers was found to justify a denial of class certification where unfair competition by an industry leader/distributor was alleged. The court noted, "Plaintiffs and the proposed class members vigorously compete with one another for distribution of their beer products. Distributors cannot service every brand of beer. Competition for the distribution services of beer distributors results in a conflict that goes to the merits of this litigation. [Citation.]" (*Ibid.*)

■ When a court decides a proposed class certification request, to consider issues of adequacy and fairness of representation, it will evaluate "the seriousness and extent of conflicts involved compared to the importance of issues uniting the class; the alternatives to class representation available; the procedures available to limit and prevent unfairness; and any other facts bearing on the fairness with which the absent class member is represented." (*Blackie v. Barrack* (9th Cir. 1975) 524 F.2d 891, 910, fn. omitted.) Although the trial court has discretion to make such a determination, its order certifying a class must not be based upon improper criteria or incorrect assumptions. (*Washington Mutual, supra,* 24 Cal.4th at p. 914.)

In *B.W.I. Custom Kitchen v. Owens-Illinois, Inc.* (1987) 191 Cal.App.3d 1341, 1351 [235 Cal.Rptr. 228] (*B.W.I. Custom Kitchen*), the court addressed the issue of when a proposed class is able to supply proof on a generalized basis that defendants' overcharges or inflated prices were "passed-on" to them. The court summarized the question as follows, "Whether the necessity of tracing a price-fixed product through the chain of distribution presents such complex individual issues that injury cannot be proven on a class-wide basis is the issue most vigorously contested herein." (*Ibid.*) The court noted that it was an unresolved issue in California whether a defendant in a Cartwright Act suit should be able to assert a "pass-on defense," (i.e., that any overcharges that it caused to a plaintiff by selling a product did not cause lasting injury, because the plaintiff then passed on any losses to the next purchaser of the product). On this point, the court's language was, "Whether defendants can bar class certification or negate injury by showing plaintiff and the class 'passed on' the overcharge is a question that has not been addressed by any California court, and it would be premature to resolve it at this juncture because we do not have an adequate factual record. However, even if a plaintiff has passed on the entire overcharge, he or she is not per se precluded from otherwise proving injury. For example, even though the entire overcharge has been passed on, the plaintiff may have lost a percentage share of the market or otherwise suffered reduced sales." (*B.W.I. Custom Kitchen, supra,* at p. 1353, interpreting *Illinois Brick Co. v. Illinois* (1977) 431 U.S. 720 [52 L.Ed.2d 707, 97 S.Ct. 2061].)[10]

---

[10] It should be noted that this issue of the availability of a "pass-on defense" in antitrust law still remains an open question in California, at least according to the only case that has cited to *B.W.I. Custom Kitchen, supra,* 191 Cal.App.3d 1341, on this point, *Basurco v. 21st Century Insurance Company* (2003) 108 Cal.App.4th 110, 120 [133 Cal.Rptr.2d 367]. At this class certification stage of the action, we need not address this issue on the merits. However, we will also be referring to it in part II.B, *post,* as it arises in the context of whether the proponents of the class have made an adequate showing that they can prove classwide injury as indirect purchasers of copper products. (See also *In re Methionine Antitrust Litigation* (2001) 204 F.R.D. 161, 166.)

With these considerations in mind, we turn to the parties' respective showings about the nature of the putative class members' interests in recovering damages under the Cartwright Act. According to J. P. Morgan as petitioner, there are serious and extensive conflicts of interest among the proposed class members, which outweigh the issues that they have in common. Specifically, the nature of the copper distribution chain is that the entities involved routinely buy and sell among each other, in different capacities in different transactions. The classes certified currently include copper and/or scrap/recycled copper producers, fabricators and semi-fabricators, manufacturers, retailers, traders, and scrap merchants. The ruling states that "the present class definition is restricted to the purchasers of copper products with more than 80 % copper and certain enumerated products." However, evidence was presented that the same lot of copper may change hands several times among the businesses involved. The proposed class does not consist of a single distribution level whose members all bought the product from the same supplier. (See *B.W.I. Custom Kitchen, supra,* 191 Cal.App.3d at p. 1352.) Rather, depending on whether each putative class member was acting as a buyer or a seller in a particular transaction, it may have an interest in showing that, as a buyer, it paid an inflated price, but as a seller, it sold at a fair price, unaffected by any alleged price inflation. If each transaction within the three-year proposed class period will have to be analyzed individually at trial, that would make class certification inappropriate. (*Lockheed Martin, supra,* 29 Cal.4th at p. 1108.)

Moreover, even if a purchaser of copper product (or scrap/recycled copper) suffered from an overcharge that was attributable to the defendants' anticompetitive behavior, there is a legitimate question whether any such overcharge was passed on to the next purchaser, such that the original purchaser would have recovered any losses when it disposed of the product. (*B.W.I. Custom Kitchen, supra,* 191 Cal.App.3d at pp. 1351–1353.) Such a pass-on defense is not precluded by California law. (*Ibid.*) ■ Also, where there is competition among the various proposed class members for the business of each other, their common interests may be outweighed by their individual interests. (*In re Beer Distribution Antitrust Litigation, supra,* 188 F.R.D. 549, 554; see *In re Methionine Antitrust Litigation, supra,* 204 F.R.D. 161, 165.) This may create conflicts of interest among them that would defeat class status.

In opposition, plaintiff Heliotrope mainly argues it was like any other consumer of a product who purchased the product at a price level that was inflated by anticompetitive behavior. Plaintiff also argues that any problems in damages analysis, such as duplicative damages, can be handled at the claims distribution stage of the proceedings, after the liability phase has been resolved. However, we think plaintiff's arguments beg the real question, which is how much a proposed class member was affected by the alleged

anticompetitive conduct, as a buyer from the defendants, for purposes of evaluating both liability for and the total amount of any damages sustained. It cannot be disregarded here that all class members commonly took different roles in different transactions, often concerning the same product. ■ As stated in *Rosack v. Volvo of America Corp.* (1982) 131 Cal.App.3d 741, 753 [182 Cal.Rptr. 800] (*Rosack*), for class certification purposes, if the plaintiffs can establish a conspiracy to fix prices, and that they purchased the affected goods or services, the fact of injury or impact of the conspiracy can be treated as a common question. However, here, many different types of purchases and sales are alleged, so the issue of common interests is not so simple.

■ Thus, the difficulty here is in proving not only that there was a conspiracy to create the alleged price inflation, but also that it had maximum impact at the moment when the proposed class members' actionable purchases were made. This was a complicated and multilevel business structure in which the proposed class members were operating, in both buyer and seller capacities, and over a long period of time. Although the trial court found such challenges should go to the weight of the evidence, and need not be resolved at the stage of a motion to certify the class, we think this analysis is incomplete, because the wide-ranging evidence presented of the nature of this industry made it impossible to overlook the potential conflicts between class members, even at the preliminary class certification stage. The factual showing made here in opposition to the motion undermines any finding that the necessary community of interest is present, for both liability and damages purposes. As stated in *Caro v. Procter & Gamble Co., supra,* 18 Cal.App.4th 644, 656, a class determination will generally involve considerations on the merits that are " ' "enmeshed in the factual and legal issues comprising the plaintiff's cause of action." ' " Such factors show that common issues do not predominate here. (*Blackie v. Barrack, supra,* 524 F.2d at p. 910.)

Accordingly, this record will only support a conclusion that the trial court abused its discretion in disregarding the evidence of a conflict of interest among the proposed class members that "goes to the very subject matter of the litigation." (*Richmond v. Dart Industries, Inc., supra,* 29 Cal.3d at p. 470.) The petition is meritorious on this point.

### B

#### SHOWING OF CLASSWIDE INJURY AND PROOF OF INJURY

To support a showing of community of interest among class members, the proponent of certification must show that questions of law or fact common to the class "predominate" over the questions affecting the individual members. (*Washington Mutual, supra,* 24 Cal.4th 906, 913–914.) "In essence, this

means 'each member must not be required to individually litigate numerous and substantial questions to determine his [or her] right to recover following the class judgment; and the issues which may be jointly tried, when compared with those requiring separate adjudication, must be sufficiently numerous and substantial to make the class action advantageous to the judicial process and to the litigants.' [Citation.] A class action should be certified only if it will provide substantial benefits both to the courts and the litigants. [Citations.]" (*Ibid.*)

Here, the petition attacks the class certification order on the basis that the proposed class lacks the necessary community of interest with regard to proving either the basic alleged antitrust violations, or the resultant injury to plaintiffs as a class. In *Rosack, supra,* 131 Cal.App.3d 741, 752, this latter proof of injury requirement is also characterized as " ' "impact," "causation," "fact of damage," and "fact of injury," ' " and the court explained: " 'If plaintiffs have stated claims of illegality and impact which can be proved predominantly with facts applicable to the class as a whole, rather than by a series of facts relevant to only individual or small groups of plaintiffs, then prosecution of this case as a class action is appropriate and desirable. [Citation.] If classwide proof of illegality and impact is not possible, the class must be decertified.' [Citation.]"

In *B.W.I. Custom Kitchen, supra,* 191 Cal.App.3d 1341, the court noted that if classwide issues of antitrust violations and impact upon the class members may be resolved as common questions, then it is appropriate to treat the individual damages issues within the class action context. For example, a bifurcated trial, subclasses, or other remedial procedures could be used to make individual damage determinations. (*Id.* at p. 1354.) In some such cases, it is justified for courts to assume that "consumers were injured when they purchased products in an anticompetitive market, even though the price and terms of sale for the price-fixed product were individually negotiated." (*Id.* at pp. 1352–1353, citing *Rosack, supra,* 131 Cal.App.3d at pp. 759–760.) In the consumer context, at least a portion of the illegal overcharge by a manufacturer will presumably be passed on by the independent distributors to consumer class members in the form of higher prices. However, in a case in which the subject product was substantially altered or added to when it was received by a middleman from the manufacturer, the effects of any price-fixing by the manufacturer will be obscured and classwide proof of injury will be more difficult. (*B.W.I. Custom Kitchen, supra,* 191 Cal.App.3d at p. 1352.) The latter facts fit this case more closely.

In *Lockheed Martin, supra,* 29 Cal.4th 1096, the Supreme Court found that even though some common issues had been demonstrated, the necessary showing of classwide proof of illegality and impact was lacking. (*Id.* at

pp. 1106–1111.) There, the plaintiffs alleged the defendants' operations had negligently discharged dangerous chemicals that contaminated the city's drinking water with harmful toxins and that this contaminated water was used by a large portion of the city's residents. "Plaintiffs moved for certification of a 'medical monitoring' class defined as 'People who were exposed to water contaminated with any of [a long list of] chemicals' " over a certain period of time, in a certain area. (*Id.* at p. 1102.) The Supreme Court reversed the trial court's order certifying that class and a punitive damage class, on the basis that the causation and damages issues raised by plaintiff's personal injury claims would have to be litigated individually, even if the matter were allowed to proceed on a class basis, because the necessary predominance of common issues of law and fact was missing. "The questions respecting each individual class member's right to recover that would remain following any class judgment appear so numerous and substantial as to render any efficiencies attainable through joint trial of common issues insufficient, as a matter of law, to make a class action certified on such a basis advantageous to the judicial process and the litigants." (*Id.* at p. 1111.)

In this case, the trial court accepted plaintiff's showing, based on the expert economist report by Dr. Kane, that causation of injury was established. The facts were that Dr. Kane had assumed causation of injury for purposes of his analysis, but at his deposition, defendants had failed to provide him with any other definition of causation. Accordingly, the trial court reasoned, "Dr. Kane's report reflects that if plaintiff proves the conspiracy caused a rise in the LME price of copper, then it follows that this illegal activity caused a price increase to the purchasers of copper products. The report indicates there is a correlation between manipulations and resulting damages. . . . 'Copper prices on the LME and COMEX move, unambiguously, in near-perfect lock step.' "

We think this analysis by the trial court on causation failed to account adequately for other evidence in the record that disputed whether a correlation between changes in copper futures prices on the LME and the COMEX will establish injury in fact to all the proposed class members on the cash market. Other than the assumption by the expert economist Dr. Kane, there was no showing that changes in COMEX prices necessarily caused changes in prices in the physical or cash copper markets, which, in turn, resulted in injury to the class members. Before the certification motion was heard, the defense conducted discovery from a number of putative class members, and brought forth evidence that these merchants and buyers did not uniformly and predictably price their copper transactions solely on the COMEX prices. There were other factors involved, such as customer relationships, the use of different suppliers, or the purchase of different products. Unlike in the settlement classes in the related cases, causation and liability are still in dispute here. The burden was on Plaintiff to show sufficient causation of

injury to justify certifying the class as to both liability and damages, and it did not meet this burden. (*Rosack, supra,* 131 Cal.App.3d at p. 752.)

There was also evidence that to the extent the proposed class members used COMEX prices to set prices in the physical or cash copper market, these class members relied on different types of COMEX prices, which included spot prices, daily closing prices, or forward prices. Also, some members of the proposed class used loss mitigation techniques, such as hedging, to protect against increases in copper prices, as well as passing on any inflated prices in subsequent resales. When the trial court merely relied on the expert evidence to assume causation of the fact of injury, it failed to account for these other legitimate factors in the record going toward whether classwide proof of injury could be accomplished, particularly as to causation. This evidentiary showing by the defense may support a pass-on defense, due to the factual showing of changes made in the products during the distribution chain, and the multiple roles played by the proposed class members. Therefore, this was not a case in which classwide proof of illegality and impact could readily be proved, such that individual damages issues should also be appropriately handled in the class action context. (*B.W.I. Custom Kitchen, supra,* 191 Cal.App.3d at pp. 1351–1353.)

A final factor raised regarding the classwide proof of injury issue is the underlying analysis in the companion action's summary judgment proceedings, in which the individual GMMC motion for summary judgment was denied in the *National Metals* case. There, the court made a ruling that stated that even though "some effort will be necessary in determining the level of copper in the scrap purchased by National Metals, damages can be reasonably calculated." Further, the trial court found National Metals had shown issues of material fact on whether all of the increases in the price of copper were passed on to its customers. Additionally, triable issues of fact were found in that case on whether the damages sustained by National Metals, as a plaintiff dealing with GMMC, should be measured by the final price paid for the scrap copper, or by the overpayment of the copper component of that price stemming from alleged antitrust violations. Necessarily, since that motion was specific to the business practices of National Metals and GMMC, those factual findings were not broad enough to extend to all potential class members and are not dispositive in this class certification context. We therefore need not address the arguments of Plaintiff in this action regarding the relevance of that summary judgment ruling, as found in its opposition to this writ petition.

Based on the record before us, we conclude the trial court's exercise of discretion to certify this class was not justified, in light of the demonstrated proof problems and the class definition problems regarding the fact of

classwide impact or injury from the alleged anticompetitive conduct. Many of the facts shown thus far appear to be relevant only to small groups of plaintiffs, and thus class action treatment is not appropriate. (*Rosack, supra,* 131 Cal.App.3d at p. 752.) Here, as in *Lockheed Martin, supra,* 29 Cal.4th at page 1111, "The questions respecting each individual class member's right to recover that would remain following any class judgment appear so numerous and substantial as to render any efficiencies attainable through joint trial of common issues insufficient, as a matter of law, to make a class action certified on such a basis advantageous to the judicial process and the litigants."

## C

### Choice of Law Issues

J. P. Morgan emphasizes the choice of law issue in bringing its petition to challenge the class certification order. ■ As already outlined in *Washington Mutual, supra,* 24 Cal.4th 906, a three-step governmental interest analysis must be applied to address conflict of laws claims and to ascertain the most appropriate law applicable to the issues. This requires the foreign law proponent (1) to make a showing identifying the applicable rule of law in each potentially concerned state and how it materially differs from the law of California; (2) if the applicable laws differ, to make a showing what interest, if any, each state has in having its own law applied to the case; (3) assuming that these laws are materially different and that each state has an interest in having its own law applied, such that there is an actual conflict of laws, the proponent must then make a showing on why the court should select the law of one state, e.g., because its interests would be "more impaired" if its law were not applied. (*Id.* at pp. 919–920.) At all times, the class action proponent will bear the burden of establishing the propriety of class certification, by demonstrating the predominance of common issues of law and fact, and manageability of the proposed class. (*Id.* at p. 922.)

■ Also in *Washington Mutual, supra,* 24 Cal.4th 906, the Supreme Court further explained the burden that the class action proponent must bear to "demonstrate . . . that state law variations will not swamp common issues and defeat predominance." (*Id.* at p. 926.) A thorough analysis of all the applicable state laws is required, so that the trial court may "make a detailed assessment of how any state law differences could be managed fairly and efficiently at trial, for example, through the creation of a manageable number of subclasses." (*Ibid.*) Nationwide class actions should be certified only where they will result in substantial benefits both to the litigants and the courts. (*Ibid.*)

With these rules in mind, we turn to the order under review. In rejecting the J. P. Morgan opposition to the class certification motion, the trial court

acknowledged that there were significant variations in the laws between California and the numerous included states, but decided that these variations were not so complex as to render the proposed classes unmanageable. The opposition papers below briefed several key differences in antitrust law among the various included states, as follows: Differences in standing rules for indirect purchasers in antitrust cases, whether extraterritorial application is allowed for certain states' antitrust statutes, and what different limitations periods apply for state antitrust actions. Also, some of the included states had different types of "pass-on" defenses to antitrust actions, and different damages rules, such as whether treble damages were allowed. (See fn. 4, *ante.*)

In granting the class certification motion, the trial court appeared to rely mainly on the contacts of one particular defendant with California, specifically GMMC: "As set forth in this court's final ruling of September 3, 2002, regarding defendant [GMMC] Global's motion for summary judgment, Global had significant contacts with California involving its employees that controlled and supervised $50 million in copper warrants and 20,000 metric tons of copper shipments to and from the London Metals Exchange ("LME") licensed warehouse located in Long Beach, California. Global participated, traveled to, and negotiated a significant number of complex transactions that involved ties to California. Even with the limited period of time after this warehouse opened in 1995, the court [in the summary judgment ruling] found these contacts significant, and ruled that applying California choice of law provisions was neither arbitrary of unfair. [Citation.] . . . Plaintiff's causes of action are based upon conspiracy. The court's reasoning on Global's motion for summary judgment applies equally here. *California law may be applied and since there is no state that has a greater interest in having its laws applied, there is no undue complexity and no conflict of laws.*" (Italics added.)

Although the class certification ruling does not expressly incorporate all of the earlier summary judgment ruling in the companion *National Metals* action, it appears to impliedly do so. Thus, we must address its reasoning. Specifically, at the summary judgment stage, the trial court had dealt with the three-step governmental interest analysis to address conflict of law claims, by ruling that since the defense (GMMC) had not established the second prong of the governmental interest analysis, the plaintiff (National Metals) was correct that it was unnecessary to address the third element. The ruling also mentioned that there were factual issues about damages, i.e., whether the injury to the plaintiff was the final price it paid for the product, or merely the overpayment of the copper component of that price stemming from antitrust violations, such that extraneous costs, which may vary, are irrelevant to the lawsuit. Also, the court noted it would be relevant whether all of the increases in the price of copper were passed on to the plaintiff's customers. To the extent

that this referenced summary judgment reasoning is relevant, we disagree with the trial court's approach, for the reasons we next explain.

■ First, a court should not ordinarily construe a statute as regulating occurrences outside the state unless a contrary intention is clearly expressed or reasonably can be inferred from the language or purpose of the statute. (*Norwest Mortgage, Inc. v. Superior Court* (1999) 72 Cal.App.4th 214, 222 [85 Cal.Rptr.2d 18].) Even though a forum state may have personal jurisdiction over the defendant, in order to apply its law, "the forum still must have significant contact or a significant aggregation of contacts to the claims asserted by each member of the plaintiff class to ensure that application of the forum law to each plaintiff's claim is not arbitrary or unfair. [Citation.]" (*Id.* at p. 226.)

Although the trial court appeared to rely primarily upon the showing of the defendant GMMC's activity in California at its Long Beach warehouse, it should be noted that GMMC is no longer a party to this particular action. The role of the J. P. Morgan defendants was that of financiers who operated in the copper marketplace. Plaintiff Heliotrope assumed that some classwide injury must have taken place in California, since some of the defendants operated here, and some of the proposed class members also had contacts here. However, our main focus should be on whether plaintiff's proposed class members made an adequate showing of their own significant contacts with California, such that their claims predominantly arose here, and gave rise to a significant interest on the part of California in applying its laws to these classwide claims. (*Washington Mutual, supra,* 24 Cal.4th at pp. 928–929.) Plaintiff's showing on behalf of the proposed class only amounted to a listing of the various included states' statutes regulating anticompetitive conduct, and an assertion that because conspiracies were alleged, perforce, some of this activity must have taken place in California. Plaintiff explained that the class had been designed to include class members located only in states that, like California, allow "indirect purchasers" to bring antitrust actions.

This showing by plaintiff falls short of a clear demonstration that the hundreds or thousands of proposed class members from states other than California, who conducted their business in other states, nevertheless have brought themselves within the protection of the Cartwright Act. ■ A court presented with a request to certify a nationwide class may legitimately ask whether it is of benefit to the courts and plaintiffs of this state to do so. (*Osborne v. Subaru of America, Inc.* (1988) 198 Cal.App.3d 646, 662 [243 Cal.Rptr. 815].) California definitely has an interest " 'in deterring fraudulent conduct by businesses headquartered within its borders and protecting consumers from fraudulent misrepresentations emanating from California . . . .' " (*Id.,* at p. 663, quoting *Clothesrigger, Inc. v. GTE Corp.* (1987)

191 Cal.App.3d 605, 614 [236 Cal.Rptr. 605].) However, in this case, petitioner defendants, J. P. Morgan et al., allege in their petition they are not headquartered in California. Nor has plaintiff made a showing that defendants made misrepresentations emanating from this state. In *Osborne, supra*, 198 Cal.App.3d 646, the appellate court agreed it was inappropriate to certify a nationwide class in California where neither of the defendants was headquartered in California, and their products were not manufactured here, and the only connection between the products and California was that some of them were delivered through a California port of entry in Long Beach. (*Id.* at p. 663.) The court said, "In our view, this minimal connection with California, which bears no causal relationship to the defects asserted by plaintiffs, is insufficient to impose on California a special obligation to undertake this nationwide class action. Neither our busy trial courts nor our citizens who fund them can afford the luxury of volunteering to handle the nation's class actions." (*Id.* at p. 664.) These considerations also apply here.

In its ruling, the trial court accepted plaintiff's argument that it had adequately shown what the laws of the numerous included states were, and that they had no particular interest in applying their own laws to these claims. Without addressing the showing that defendants had made of certain material differences in antitrust law among the other included states, the trial court found it was not necessary to weigh the interest of those states as against the interest of California in resolving the classwide claims of nonresident class members. We believe this was error, because it was not supported by a showing of the significant connection of the proposed class members' claims with California, either because they arose here or because defendants' actions were conducted to a significant extent here. Rather, it would have been appropriate for the trial court to reach the third step of the governmental interest analysis by considering the comparative interests of the various states of residence of the proposed class members. Had it done so, it would have found a lack of significant connection of these claims to California. The trial court did not follow the approach set out in *Washington Mutual, supra,* 24 Cal.4th 906, by making a thorough analysis of the various applicable state laws, and assessing in detail how any state law differences could be managed fairly and efficiently at trial. (*Id.* at p. 926.) ▉ The rule is that nationwide class actions should be certified only where they will result in substantial benefits both to the litigants and the courts. (*Ibid.*) No such substantial benefit was shown here.

▉ In reviewing the class certification order, we are mindful of the Supreme Court's guidance in *Washington Mutual, supra,* 24 Cal.4th at pages 928 to 929, that determinations regarding the choice of applicable law chiefly affect the questions of predominance of common issues and manageability. However, conflict of laws issues also affect the remaining requirements in the community of interest criteria, i.e., "whether the representative plaintiffs have

claims or defenses typical of those of the class or whether the representative plaintiffs can fairly and adequately protect the interests of the entire class." (*Ibid.*) Determinations of predominance and manageability will vary case by case, depending upon individual factors such as the number and nature of the legal theories and evidentiary issues presented in the case, as well as the size and scope of the proposed class. (*Id.* at p. 929.) In this case, the trial court failed to account adequately for the extraordinary complexity of the legal theories and evidentiary issues presented in the case, as well as the size and scope of the proposed class, in determining that a multistate class was appropriately certified. Rather, those factors as shown in this record indicate this order is not supported by substantial evidence and the trial court abused its discretion in certifying the proposed class here.

## DISPOSITION

Let a writ of mandate issue directing the trial court to vacate its order of class certification and to enter a new order denying the motion. Each party to bear its own costs.

Nares, J., and O'Rourke, J., concurred.

A petition for a rehearing was denied December 3, 2003, and the petition of real parties in interest for review by the Supreme Court was denied February 24, 2004.