[No. B194374. Second Dist., Div. Three. May 28, 2008.]

HARMON T. SHARP III et al., Plaintiffs and Appellants, v.
NEXT ENTERTAINMENT INC. et al., Defendants and Appellants.

DANIEL A. SHRIVER et al., Plaintiffs and Appellants, v.
ROCKET SCIENCE LABORATORIES et al., Defendants and Appellants.

414

**COUNSEL**

Rothner, Segall & Greenstone, Glenn Rothner, Emma Leheny, Jean Shin; and Robert D. Newman for Plaintiffs and Appellants.

Altshuler Berzon, Scott A. Kronland, Danielle Leonard and Rebecca Smullin for the Service Employees International Union, the American Civil Liberties Union of Southern California, Protection and Advocacy, Inc., and The Impact Fund as Amici Curiae on behalf of Plaintiffs and Appellants.

Mitchell Silberberg & Knupp, William L. Cole, Jeffrey L. Richardson, Emma Luevano and Seth A. Stevelman for Defendants and Appellants.

**OPINION**

**ALDRICH, J.—**

## I.

## INTRODUCTION

The Writers Guild of America (the Guild) had reason to believe that reality television production companies and television networks violated wage and labor laws. The Guild held meetings during which employees of reality television discussed the purported violations. Some who participated in the meetings, along with other reality television employees, agreed to be the named plaintiffs in two wage and labor law class action lawsuits against the production companies and the networks (collectively defendants). Thereafter, the trial court denied defendants' motion to disqualify plaintiffs' counsel, but did disqualify some plaintiffs from acting as representatives of the putative classes.

On appeal from the trial court's order denying the disqualification order, defendants rely on California Rules of Professional Conduct of the State Bar, rule 3-310 (Rule 3-310) to contend that the trial court erred in failing to disqualify counsel for plaintiffs. This contention is based upon the facts that the firm who represented the Guild was also counsel for plaintiffs, the Guild paid for plaintiffs' attorney fees and costs, and the litigation was conceived by the Guild as part of its organizing campaign, a campaign which many plaintiffs supported. Defendants use many of the same facts to further contend that the trial court erred in failing to disqualify all plaintiffs from their roles as representatives of the uncertified classes.

In the published portion of this opinion (pts. I., II., III.A. & IV.), we hold that the trial court did not err in failing to disqualify class counsel and the trial court did not err in refusing to disqualify all plaintiffs from acting as the named representatives of the putative classes.

In their cross-appeal, plaintiffs appeal from the trial court's orders directing their counsel to ask them certain questions relating to their association with the Guild. In the unpublished portion of this opinion (pt. III.B.), we hold that the trial court's orders were vague.

Thus, we affirm in part and reverse in part.

## II.

### FACTUAL AND PROCEDURAL BACKGROUND

A. *The underlying facts*

The Guild is a labor organization representing writers of film, television, news media, documentaries, animation, CD-ROM, and news media technology.

Reality television programs use ordinary people rather than professional actors in unscripted dramatic or humorous situations. The Guild believed that these shows were produced on low budgets with short deadlines, and were profitable, in part, because employees routinely worked very long hours, without breaks or overtime pay. Among other information the Guild received was that reality television employees had been paid a flat, weekly rate, but often were provided with fraudulent pay records showing they had received overtime pay.

Between January and June 2005, the Guild held a number of meetings with people working in reality television. Approximately 75 to 100 employees

attended these meetings. This unstructured group was referred to as the reality television "organizing committee." The group discussed what they perceived as widespread violations of a number of state wage and hour laws, including minimum wage and overtime violations.

In early 2005, David Joseph Young, the Guild's interim executive director, had numerous conversations with Guild staff members and outside counsel, Anthony Segall, to evaluate possible litigation on behalf of reality television employees who provided services relating to story development.[1] Attorney Segall noted that by violating wage and hour laws, certain reality television employers were able to unfairly compete with unionized companies that paid legal wages. He believed that wage and hour enforcement lawsuits would create economic pressure on those who paid illegal wages. He also opined that litigation against reality television employers could facilitate the Guild's unionizing campaign. He foresaw such litigation as having strategic value because it would "create a more level playing field" and "decrease[] the incentive to not be union if [the reality television employers had] to . . . play by those same rules." Director Young believed wage and hour lawsuits might force reality television production companies to recognize the Guild as the exclusive bargaining unit for their employees.

Attorney Segall and Attorney Emma Leheny were partners in the law firm of Rothner, Segall & Greenstone (the Rothner firm). The firm had represented the Guild in a significant number of matters for many years.

In the summer of 2005, Attorneys Segall and Leheny attended meetings of the Guild's organizing committee, at which time potential lawsuits were discussed. Some employees who attended the meetings expressed an interest in participating in wage and hour litigation against their reality television employers. These employees were informed that the Guild would subsidize the cost of the litigation and were referred to the Rothner firm.

Of the 21 employees who would become the named plaintiffs in the two lawsuits giving rise to this appeal, 16 had attended meetings of the Guild's organizing committee. These employees recruited others, who also would serve as representative plaintiffs in the two lawsuits.

All 21 employees met with, and retained, the Rothner firm as class counsel. The Guild, which had selected the firm, agreed to pay the litigation expenses, including costs and the firm's hourly rate.

---

[1] The job titles for the employees who provided services relating to story development differed from company to company. The titles included: assistant, assistant story editor, story editor, story producer, story assistant, segment producer, supervising story producer, producer, senior producer, field producer, format producer, and editor.

Each of the 21 employees signed a conflict waiver acknowledging that the Guild would subsidize the attorney fees for the two class action lawsuits and that the firm represented the Guild in other matters. For simplicity, we refer to these 21 persons as plaintiffs. Plaintiffs were adamant that they would control the litigation and decide the strategy and the outcome of the lawsuits. The Guild informed plaintiffs that they would control the cases, and not the Guild.

### B. *Procedural history*

#### 1. *The two related cases*

On July 7, 2005, 12 plaintiffs, including Harmon T. Sharp III and Troy DeVolld, filed a class action lawsuit on their behalf and similarly situated employees against four reality television production companies and four television networks for violations of state wage and hour laws relating to eight reality television programs, *Sharp v. Next Entertainment, Inc.* (Super. Ct. L.A. County, 2006, No. BC336170). These plaintiffs alleged violations of the Labor Code, specifically that these eight defendants failed to pay wages and overtime, provide meal and rest breaks, provide wage statements, or keep required records. The class was described as "those persons who are or have been employed by the defendants to perform services relating to story development for reality television series."[2]

On August 23, 2005, 10 plaintiffs, including Daniel A. Shriver and Jubba Seyyid, filed a class action lawsuit against a producer of reality television programs and one television network, relating to seven television shows, *Shriver v. Rocket Science Laboratories* (Super. Ct. L.A. County, 2006, No. BC338746). This second lawsuit also alleged Labor Code violations and defined the class in the same manner as the first lawsuit.[3]

Both lawsuits sought, among other relief, attorney fees and costs pursuant to Labor Code sections 218.5, 226, subdivision (e), 558, and 1194.

---

[2] The 12 plaintiffs in case No. BC336170 are: Harmon T. Sharp III, Troy DeVolld, Sarah Levine, Michael M. Gara, Eduardo Penna, Emily Sinclair, J. Ryan Stradal, Kevin Thomas, Thomas L. Hietter, Nicole L. Hedlund, Christian T. Huber, and Brian N. Gibson.

Defendants in case No. BC336170 are: Next Entertainment, Inc., Telepictures Productions, Inc., Syndicated Productions, Inc., Dawn Syndicated Productions, Inc., American Broadcasting Company, Inc., CBS Broadcasting, Inc., WB Broadcasting Network, and Turner Broadcasting System, Inc.

[3] The 10 plaintiffs in case No. BC338746 are: Daniel A. Shriver, Jubba Seyyid, Andrea Archer, Zachary H. Isenberg, Valerie C. Ahern, Joseph L. Weiss, Victoria Dew, Brian N. Gibson, Lowell Goodman, and Alastair Surprise. (Brian N. Gibson is also a named plaintiff in case No. BC336170.)

Defendants in case No. BC338746 are: Rocket Science Laboratories and the Fox Broadcasting Company.

A few months after the lawsuits were filed, the Guild hired Attorney Segall to serve as the Guild's general counsel. He had been working as its outside counsel. When he became general counsel, Attorney Segall was given an office at the Guild, where he usually worked two days a week. Attorney Segall continued to be a partner in the Rothner firm. As the Guild's general counsel, Attorney Segall was responsible for overseeing various legal matters, including advising the Guild with respect to its unionizing activities.

In August 2005, one plaintiff informed the media that the Guild had helped a group of reality television writers and editors file a class action lawsuit "to end the companies' exploitative practices in this burgeoning and profitable sector of the Hollywood economy." Attorney Segall informed the media that the Guild would file lawsuits "as part of an organizing campaign until the objectives of the organizing campaign are met." The lawsuits were also mentioned on the Guild's Web site and in a number of news releases as part of the Guild's larger strategy to organize reality television employees.

The Rothner firm continued to represent the Guild in other matters. The Guild continued to help coordinate communication with plaintiffs and set up meetings at the Guild regarding the lawsuits.

After defendants in both cases answered, the trial court deemed the two cases related.

### 2. *Discovery*

The parties conducted extensive discovery. Defendants indicated they would depose Guild employees and two plaintiffs from each class action lawsuit to advance the theory that the Guild was the driving force behind the litigation. Plaintiffs objected to this discovery asserting, in part, that it intruded on their rights of association.

Defendants filed a motion to compel. In opposing the motion and in subsequent depositions, plaintiffs claimed the attorney-client privilege, based in part upon the common interest privilege. In raising this objection, the Rothner firm stated that "[t]he Guild and the plaintiffs share a common interest: the full payment to reality television writers of all wages earned." The Rothner firm informed defendants that "the [Guild] and the named plaintiffs share a common interest in the subject of this litigation and are thus entitled to communicate with their attorneys and with one another to further their common interest."

In March 2006, the trial court denied in part and granted in part defendants' motion to compel. The trial court ordered plaintiffs to respond to one

document request and six interrogatories, and permitted defendants to take the depositions of designated Guild employees and four plaintiffs (two from each lawsuit).

Thereafter, the parties stipulated to the following facts: (1) the Rothner firm represented the Guild in other matters and this fact had been revealed to plaintiffs; (2) the Guild had been involved in investigating and providing material support to litigate both lawsuits; (3) the Rothner firm had entered into written agreements with plaintiffs that included mandatory disclosures regarding a third party payor, which was the Guild; and (4) the Guild was paying the hourly rate of the Rothner firm and had advanced all litigation costs. Additionally, the Guild offered to stipulate that it did not make decisions regarding legal strategies, nor did it control the litigation.

The Rothner firm represented Guild director Young when he was deposed by defendants. Among other statements, Young testified that the Rothner firm was not required to obtain, nor had it obtained, approval from the Guild before it performed any task in the two related class action lawsuits. At times during the deposition, Young was instructed not to answer based upon the common interest privilege. Thereafter, Young signed a declaration in which he declared it was his understanding that litigation decisions would be made by plaintiffs and their counsel, and not by the Guild.

Four plaintiffs (Sharp, DeVolld, Shriver and Seyyid) testified in their depositions that one of their personal goals for being involved in the lawsuits was to assist the Guild in its campaign to organize reality television employees.

While the parties were involved in the discovery disputes, Attorney Leheny filed a charge with the National Labor Relations Board (the NLRB) alleging defendants' discovery interfered with plaintiffs' right to engage in concerted activity protected by the National Labor Relations Act (29 U.S.C. § 151 et seq.). Subsequently, the Guild withdrew the NLRB charge.

### 3. *The motion to disqualify, the August 9 and 11, 2006, orders, and defendants' appeal*

#### a. *Defendants' motion to disqualify and the trial court's August 9 and 11, 2006, orders*

On June 5, 2006, the Guild signed a conflict waiver acknowledging that it would not interfere with the independent professional judgment of plaintiffs' counsel and memorializing the fact that plaintiffs and not the Guild controlled the litigation.

In July 2006, defendants brought a motion to disqualify the entire Rothner firm. Defendants also sought to disqualify all 21 plaintiffs from their roles as representative parties.[4] Defendants argued: "The discovery ordered by this Court regarding conflicts affecting the named plaintiffs and their counsel confirmed defendants' prediction—that the . . . Guild . . . conceived, developed, and implemented these two class action lawsuits to advance its efforts to organize employees working on reality television programming. . . . [B]ecause the named plaintiffs and their counsel were hand picked by the [Guild], are subject to the influence of the [Guild], and have interests which conflict with those of the putative classes, they are disqualified from representing the absent class members in these cases."

In their motion, defendants raised, among others, the following arguments: (1) the interests of the Guild and plaintiffs conflicted in that the goal of the litigation was to maximize a fair, adequate, and reasonable resolution through settlement or otherwise, whereas the Guild's goal was to further its unionizing activities; (2) the divided loyalties of plaintiffs and the Rothner firm disqualified plaintiffs from acting as representatives of the putative classes; (3) the Rothner firm was disqualified because there were conflicts of interest that violated Rule 3-310; and (4) all class members of the two putative classes were required to provide written consent to the firm's representation.

As of July 27, 2006, attorneys and law clerks from the Rothner firm expended over 1,000 hours on the two lawsuits. Of the time expended, 97 percent of the work was performed by Attorney Leheny, or associates and law clerks under her direction. This included defending three motions, filing one motion, engaging in seven months of discovery, and reviewing over 8,000 pages of documents that had been exchanged.

After an August 9, 2006, hearing on defendants' motion, the trial court issued two separate orders filed two days apart on August 9 and August 11, 2006, denying the disqualification motion. The trial court held that disqualification of the entire Rothner firm was unnecessary because the Guild had not taken any direct action to interfere with the efforts to obtain maximum compensation for class members and the Guild had not taken steps to ascertain defendants' counterorganizing strategy. However, the trial court was concerned about potential conflicts of interests and the hypothetical possibility that the Guild would control, influence, or interfere with the two related class action lawsuits. The trial court noted that the "primary goal of the . . . class actions is to obtain wages and hours earned by reality show workers but unpaid[, whereas the] secondary goal . . . , according to the [Guild] and to certain of the named plaintiffs . . . is to organize such workers under [the Guild. The secondary goal is] extraneous to the remedies available under the

---

[4] As noted in footnote 3, one plaintiff was a party to both lawsuits.

current pleadings [and] irrelevant . . . to the adjudication of issues framed by the pleadings, and is allowed here only on the collateral subject of disqualification." The court concluded that these two goals did not necessarily conflict, stating: "there is nothing pernicious about [the Guild providing] legal counsel to non-union members . . . even if the union is in the process of organizing an affected class of workers."

The trial court ruled that "disqualification of class counsel is not the proper remedy, particularly in the absence of evidence that the [Guild] has taken any action that interferes with class counsel's efforts to obtain maximum compensation for members of the class (or evidence that class discovery has been skewed in the direction of ascertaining defendants' organizing counter strategies). Rather, certain prophylactic measures should be instituted to insure that the [Guild] will not influence the prosecution of the wage and hour claims." These measures included establishing ethical walls that barred members of the Rothner firm from communicating with the Guild or Attorney Segall about the litigation, except with regard to the payment of fees. The trial court ordered that "there shall be no communications between class counsel[, Attorney Leheny and those working at her direction,] and the [Guild], except for communications relating to the [Guild's] payment of legal fees and costs in prosecuting the . . . class actions, and that class counsel shall prevent [the Guild's] access to any communications other than fee and cost related communications . . . ."

Additionally, the trial court ordered the removal of the four plaintiffs who had provided deposition testimony (Sharp, DeVolld, Shriver and Seyyid) from their roles as class representatives of the putative classes because these plaintiffs had admitted in their depositions that one of their personal goals was to assist the Guild's unionizing efforts. The trial court ordered the Rothner firm to advise the remaining plaintiffs that the court "has determined that organizing the members of the class is not a proper goal of this litigation." Further, Attorney Segall, the Guild, and all plaintiffs who continued in their representative capacities were to provide written consent to the terms of the court's order. After the hearings, these written consents were obtained. Additionally, each plaintiff issued a written notice stating that organizing members of the classes was not a proper goal of the pending litigation. Class counsel (Attorney Leheny and those working at her direction) discontinued all communication with the Guild and with Attorney Segall regarding the litigation, except for discussions about the payment of fees and costs.

After the August 9, 2006, hearing, class counsel voluntarily associated as cocounsel Robert Newman, an attorney with no prior relationship with the Guild. Attorney Newman accepted the case on a contingency basis. Further,

class counsel voluntarily agreed that they would not provide legal advice to the Guild regarding its organizing campaign, nor perform any work relating to the campaign while the two cases were pending. Attorney Leheny notified Sharp, DeVolld, Shriver and Seyyid that they had been removed as class representatives. Director Young and all plaintiffs who remained as named class representatives signed forms consenting to the terms of the trial court's orders.

### b. *Defendants' appeal*

Defendants have appealed from the two orders dated August 9 and 11, 2006. They contend that the trial court erred in denying their motion to disqualify the entire Rothner firm and in denying their request to disqualify all 21 plaintiffs from their roles as representatives of the two putative classes. The four plaintiffs who were removed from their roles as representatives of the two uncertified classes (Sharp, DeVolld, Shriver, and Seyyid) have not appealed from the order removing them as representatives of the putative classes. Neither plaintiffs nor the Rothner firm have objected to the prophylactic measures imposed by the trial court, including the imposition of ethical walls.[5]

### 4. *The oral order and written ruling on the motion to clarify, and plaintiffs' cross-appeal*

At the August 9, 2006, hearing on defendants' disqualification motion, the trial court expressed some concern about plaintiffs' association with the Guild. The trial court directed Attorney Leheny to ask certain questions of those plaintiffs who had not been removed from their representative roles. On October 11, 2006, the trial court ruled on an ex parte motion to clarify its August 9, 2006, oral orders.

Plaintiffs cross-appeal from the trial court's oral orders of August 9, 2006, and from the written order of October 11, 2006.

As of the date of the filing of these appeals, the classes have not been certified.[6]

---

[5] We gave permission to the Service Employees International Union, the American Civil Liberties Union of Southern California, Protection and Advocacy, Inc., and The Impact Fund to file an amicus curiae brief in support of plaintiffs.

[6] While this appeal was pending, the parties in *Sharp v. Next Entertainment Inc.* (Super. Ct. L.A. County, 2006, No. BC336170) requested we dismiss the appeal as it relates to their case. At their request, we shall dismiss the appeal as it relates to BC336170. However, the facts and issues in the two related class action cases, BC336170 and *Shriver v. Rocket Science Laboratories* (Super. Ct. L.A. County, 2006, No. BC338746), are intertwined. Thus, for

## III.

## DISCUSSION

### A. *The appeal by defendants*

Defendants contend the trial court erred in denying their disqualification motion. They argue that the entire Rothner firm should have been disqualified and all plaintiffs should have been removed from their representative roles. We conclude that defendants' arguments are unpersuasive.

### 1. The denial of the motion to disqualify the entire Rothner firm

Defendants contend Rule 3-310(C)(1)–(3), and (F) mandate disqualification of the entire Rothner firm. Defendants argue the interests of the Guild and the interests of plaintiffs actually and potentially conflict such that the Rothner firm cannot represent both the Guild and plaintiffs. Defendants assert that the Rothner firm's duty of loyalty to the Guild creates actual and potential conflicts of interests because the Guild's interest in furthering its organizing efforts is antithetical to the sole interests of absent class members, which is to maximize the recovery on the wage and hour claims. We hold that there were effective conflict waivers and thus, the trial court did not err in declining to disqualify the entire Rothner firm.[7]

### a. *The standard of review from rulings on motions to disqualify counsel*

"Motions to disqualify counsel are especially prone to tactical abuse because disqualification imposes heavy burdens on both the clients and courts: clients are deprived of their chosen counsel, litigation costs inevitably increase and delays inevitably occur. As a result, these motions must be examined 'carefully to ensure that literalism does not deny the parties substantial justice.' [Citation.] At the same time, we recognize that disqualification of counsel is necessary under certain circumstances, to protect the integrity of our judicial process by enforcing counsel's duties of confidentiality and loyalty. ([*People ex rel. Dept. of Corporations v. SpeeDee Oil Change*

---

simplicity and continuity, we continue to refer to the parties in BC336170 along with the parties in BC338746 collectively as "defendants" and "plaintiffs."

[7] The denial of a motion to disqualify counsel can be challenged by a writ of mandamus or by filing an appeal. (*Apple Computer, Inc. v. Superior Court* (2005) 126 Cal.App.4th 1253, 1263 [24 Cal.Rptr.3d 818] (*Apple Computer*); *Meehan v. Hopps* (1955) 45 Cal.2d 213, 216–217 [288 P.2d 267] [order denying motion to disqualify counsel due to conflict of interest is appealable as an injunction order]; *Reed v. Superior Court* (2001) 92 Cal.App.4th 448, 452–453 & fn. 2 [111 Cal.Rptr.2d 842].)

*Systems, Inc.* (1999) 20 Cal.4th 1135,] 1145–1146 [86 Cal.Rptr.2d 816, 980 P.2d 371]; see also *Flatt v. Superior Court* (1994) 9 Cal.4th 275, 283–284 [36 Cal.Rptr.2d 537, 885 P.2d 950].)" (*City of Santa Barbara v. Superior Court* (2004) 122 Cal.App.4th 17, 23 [18 Cal.Rptr.3d 403], fn. omitted; see also *City and County of San Francisco v. Cobra Solutions, Inc.* (2006) 38 Cal.4th 839, 846 [43 Cal.Rptr.3d 771, 135 P.3d 20].)

"Generally, a trial court's decision on a disqualification motion is reviewed for abuse of discretion. [Citations.] If the trial court resolved disputed factual issues, the reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence. [Citations.] When substantial evidence supports the trial court's factual findings, the appellate court reviews the conclusions based on those findings for abuse of discretion. [Citation.] However, . . . where there are no material disputed factual issues, the appellate court reviews the trial court's determination as a question of law. [Citation.] In any event, a disqualification motion involves concerns that justify careful review of the trial court's exercise of discretion. [Citation.]" (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc., supra,* 20 Cal.4th at pp. 1143–1144 (*SpeeDee Oil Change*), citing *In re Complex Asbestos Litigation* (1991) 232 Cal.App.3d 572, 585 [283 Cal.Rptr. 732]; accord, *City and County of San Francisco v. Cobra Solutions, Inc., supra,* 38 Cal.4th at p. 848.)

Here, there are no factual disputes. Thus, we independently review the trial court's decision not to disqualify the entire Rothner firm.

### b. *The conflict of interest rules and Rule 3-310*

"It is well established that in considering a motion to disqualify counsel, the 'paramount concern is the preservation of public trust in the scrupulous administration of justice and the integrity of the bar.' (*Jessen v. Hartford Casualty Ins. Co.* (2003) 111 Cal.App.4th 698, 705 [3 Cal.Rptr.3d 877] . . . .)" (*Rhaburn v. Superior Court* (2006) 140 Cal.App.4th 1566, 1573 [45 Cal.Rptr.3d 464].) " 'A trial court's authority to disqualify an attorney derives from the power inherent in every court "[t]o control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with the judicial proceeding before it, in every matter pertaining thereto." (Code Civ. Proc., § 128, subd. (a)(5) . . . .)' (*SpeeDee Oil Change, supra,* 20 Cal.4th at p. 1145.)" (*City of Santa Barbara v. Superior Court, supra,* 122 Cal.App.4th at pp. 22–23.)

Disqualification of counsel not only prevents attorneys from breaching their ethical duties, but also protects the judicial process from any taint of unfairness that might arise from conflicts of interests. " 'Ultimately, disqualification motions involve a conflict between the clients' right to counsel of

their choice and the need to maintain ethical standards of professional responsibility.' [Citation.]" (*City and County of San Francisco v. Cobra Solutions, Inc., supra*, 38 Cal.4th at p. 846; accord, *Gilbert v. National Corp. for Housing Partnerships* (1999) 71 Cal.App.4th 1240, 1254–1255 [84 Cal.Rptr.2d 204] (*Gilbert v. National Corp.*).)

"A conflict arises when the circumstances of a *particular case* present 'a substantial risk that the lawyer's *representation of the client* would be materially and adversely affected by the lawyer's own interests or by the lawyer's duties to another current client, a former client, or a third person.' (Rest.3d Law Governing Lawyers [(1998) Conflicts of Interest,] § 121, italics added.) If competent evidence does not establish such a conflict, the attorney is not disqualified for a conflict." (*In re Jasmine S.* (2007) 153 Cal.App.4th 835, 843–844 [63 Cal.Rptr.3d 593].)

Rule 3-310 addresses conflicts of interests arising from the simultaneous representation of clients (or concurrent representation), as well as successive representation, i.e., when an attorney represents one client and thereafter represents another. The rule applies when the interests of the clients are directly adverse or potentially adverse. It also addresses conflicts that may arise when a third party pays a client's legal fees.

Rule 3-310, Avoiding the Representation of Adverse Interests, reads in pertinent part:

"(A) For purposes of this rule:

"(1) 'Disclosure' means informing the client or former client of the relevant circumstances and of the actual and reasonably foreseeable adverse consequences to the client or former client;

"(2) 'Informed written consent' means the client's or former client's written agreement to the representation following written disclosure;

"(3) 'Written' means any writing as defined in Evidence Code section 250. [¶] . . . [¶]

"(C) A member shall not, without the informed written consent of each client:

"(1) Accept representation of more than one client in a matter in which the interests of the clients potentially conflict; or

"(2) Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict; or

"(3) Represent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter. [¶] . . . [¶]

"(E) A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment.

"(F) A member shall not accept compensation for representing a client from one other than the client unless:

"(1) There is no interference with the member's independence of professional judgment or with the client-lawyer relationship; and

"(2) Information relating to representation of the client is protected as required by Business and Professions Code section 6068, subdivision (e); and

"(3) The member obtains the client's informed written consent, provided that no disclosure or consent is required if:

"(a) such nondisclosure is otherwise authorized by law; or

"(b) the member is rendering legal services on behalf of any public agency which provides legal services to other public agencies or the public."[8]

> c. *Purposes of Rule 3-310 and of requiring informed written consent*

Rule 3-310 and conflict of interest rules are designed to "assure the attorney's absolute and *undivided loyalty* and commitment to the client and the *protection of client confidences*." (1 Vapnek et al., Cal. Practice Guide: Professional Responsibility (The Rutter Group 2007) ¶ 4:4, p. 4-3.)

---

[8] Business and Professions Code section 6068, subdivision (e) reads: "(1) To maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client. [¶] (2) Notwithstanding paragraph (1), an attorney may, but is not required to, reveal confidential information relating to the representation of a client to the extent that the attorney reasonably believes the disclosure is necessary to prevent a criminal act that the attorney reasonably believes is likely to result in death of, or substantial bodily harm to, an individual."

Rule 3-310 contains additional provisions with regard to conflicts. The parties do not address these other provisions.

In a *successive* representation situation where a client discloses confidential information to an attorney and, thereafter, the same attorney represents another client in a matter in which the two matters bear a substantial relationship, courts focus on whether confidences have been jeopardized. (*Flatt v. Superior Court, supra*, 9 Cal.4th at p. 283; *SpeeDee Oil Change, supra*, 20 Cal.4th at p. 1146.) "The former client's expectation of confidentiality must be preserved to ensure ' " 'the right of every person to freely and fully confer and confide in one having knowledge of the law, and skilled in its practice, in order that the former may have adequate advice and a proper defense.' " ' [Citation.] The attorney must maintain those confidences inviolate and preserve them at every peril to himself or herself. (Bus. & Prof. Code, § 6068, subd. (e).)" (*People v. Baylis* (2006) 139 Cal.App.4th 1054, 1065 [43 Cal.Rptr.3d 559]; see fn. 8, *ante*.)

When considering purported conflicts of interests arising from concurrent representations, such as the situation before us, courts focus on the attorney's duty of loyalty. Attorneys who concurrently represent more than one client should not have to choose which client's interest are paramount or make a choice between conflicting duties. (*Flatt v. Superior Court, supra*, 9 Cal.4th at p. 284; *SpeeDee Oil Change, supra*, 20 Cal.4th at p. 1147; *Santa Clara County Counsel Attys. Assn. v. Woodside* (1994) 7 Cal.4th 525, 548 [28 Cal.Rptr.2d 617, 869 P.2d 1142], abrogated by statute on other grounds as recognized in *Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1077 [29 Cal.Rptr.3d 234, 112 P.3d 623].)

■ Where an attorney concurrently represents clients with directly adverse interests, in the same or wholly unrelated matters, the duty of loyalty requires disqualification in all but a few instances. (*Flatt v. Superior Court, supra*, 9 Cal.4th at pp. 284–285 & fn. 3; *Metro-Goldwyn-Mayer, Inc. v. Tracinda Corp.* (1995) 36 Cal.App.4th 1832, 1840 [43 Cal.Rptr.2d 327].) Thus, an attorney cannot represent a client in one matter and simultaneously sue that client in an unrelated matter. (*Flatt v. Superior Court, supra*, at pp. 286–290.) However, in other scenarios, the dangers of serious impropriety and the harm to the interests of protecting the public confidences in the system are outweighed by permitting clients and lawyers to contract with one another and automatic disqualification is not required. (1 Hazard & Hodes, The Law of Lawyering (3d ed. 2008 supp.) § 10.4, p. 10-12 (Hazard & Hodes).)

Additionally, the Rules of Professional Conduct recognize that there may be a conflict of interest where, such as in the matters before us, a third party is paying for the attorney to represent another person or entity. "[W]hen a third party pays for a lawyer's service to a client . . . there is [a] danger that the

lawyer will tailor his [or her] representation to please the payor rather than the client. [Citations.] The distraction can become more pronounced if the lawyer hopes to be rehired by the same payor on a recurrent basis." (Hazard & Hodes, *supra,* § 11.8, p. 11-23, fn. omitted; accord, *id.,* § 12.15, pp. 12-45 to 12-46.)

■ However, automatic disqualification is not required in all circumstances where representation of one client creates actual or potential conflicts of interests with another client or when there is a third party payor situation. Rather, clients may consent in writing (Rule 3-310(A)(2)) to continued representation by the conflicted attorney after the attorney discloses "the relevant circumstances and . . . the actual and reasonably foreseeable adverse consequences to the client . . . ." (Rule 3-310(A)(1).) In order for there to be valid consent, clients must indicate that they "know of, understand and acknowledge the presence of a conflict of interest . . . ." (*Gilbert v. National Corp., supra,* 71 Cal.App.4th at p. 1255; cf. Rest.3d Law Governing Lawyers, *supra,* § 122 ["Informed consent requires that the client or former client have reasonably adequate information about the material risks of such representation to that client or former client."]; ABA Model Rules Prof. Conduct, rule 1.0(e) [" 'Informed consent' denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct."]; see, e.g., *In re Marriage of Egedi* (2001) 88 Cal.App.4th 17, 23–25 [105 Cal.Rptr.2d 518].)

The requirement of informed written consent applies when an attorney concurrently represents more than one client in a matter in which there is a potential conflict (Rule 3-310(C)(1)), when an attorney concurrently represents more than one client in a matter in which there is an actual conflict (Rule 3-310(C)(2)), and when the attorney represents a client in one matter and simultaneously represents another client in a separate matter whose interests are adverse with those of the first client (Rule 3-310(C)(3)). (See *Zador Corp. v. Kwan* (1995) 31 Cal.App.4th 1285, 1295 [37 Cal.Rptr.2d 754].)[9]

---

[9] Plaintiffs and amici curiae assert that we should eliminate from our discussion any reference to Rule 3-310(C)(1) and (2). They contend that only these provisions address representation by an attorney of more than one client "in a matter" and that here, the Rothner firm did not represent both the Guild and plaintiffs in any single lawsuit or transaction. Plaintiffs and amici curiae also argue that Rule 3-310(C)(2) and (3) are not applicable because the representation of the Guild in its unionizing activities did not "actually conflict" nor was it "adverse" to the interests of plaintiffs and members of the putative classes.

The trial court concluded that at this point in the litigation, there was no actual conflict between the Guild's unionizing activities and plaintiffs' desire for a fair and adequate recovery for the purported wage and hour law violations. The court stated, "Two possibilities arise: the class goal of obtaining full compensation may be sacrificed to the [Guild's] goal of organizing reality show workers. Alternatively[,] the [Guild's] need to publicize a favorable settlement as

Additionally, where the cost of the client's litigation is being borne by a third party, the client must provide informed written consent to this arrangement. (Rule 3-310(F).)

■ "The concept of informed consent is a familiar one. It signifies that a person making an important decision does so on the basis of adequate knowledge of the facts and an awareness of the consequences of decision." (Hazard & Hodes, *supra,* § 11.22, p. 11-69.) " 'Giving effect to a client's consent to a conflicting representation might rest either on the ground of contract freedom or on the related ground of personal autonomy of a client to choose whatever champion the client feels is best suited to vindicate the client's legal entitlements.' [Citation.]" (*Zador Corp. v. Kwan, supra,* 31 Cal.App.4th at p. 1295.) "This is a sensible feature of the law, for it recognizes the autonomy of individuals to make reasoned judgments about the trade-offs that are at stake." (Hazard & Hodes, *supra,* § 10.8, p. 10-22.) Once the client has been provided with sufficient information about the situation, the client can make a rational choice (*ibid.*), based upon full disclosures as to the risks of the representations, the potential conflicts involved, and the alternatives available as required by the particular circumstances. (*Id.,* § 11.22, pp. 11-69 to 11-70.) By mandating a writing, the client's attention is focused "on the fact that the decision should not be taken lightly." (*Id.,* § 11.22, p. 11-71.) It will "impress upon [the] clients the seriousness of the decision the client is being asked to make and to avoid disputes or ambiguities that might later occur in the absence of a writing."

---

an organizing tool may conflict with the class members' desire to accept a maximum recovery conditioned on confidentiality. . . . [¶] There is no evidence that any settlement negotiations have been skewed in favor of organizing over compensation, nor is there any evidence that the subject of confidentiality, or for that matter, the subject of settlement, has ever come up in the litigation. [¶] At the same time, it appears from the record submitted by the parties that the [Guild's] interest in organizing is compatible with the putative class members' successful recovery of compensation. In the [Guild's] view, a successful outcome will eliminate defendants' incentive to resist organizing. . . . [A] successful outcome is in the [Guild's] and the putative classes' interests; an unsuccessful outcome, including a disappointing recovery, would reflect adversely on the [Guild], and is undoubtedly a result disfavored by the putative class, as well."

Defendants suggest the trial court erred because the conflicts of interests were actual and not potential, because some members of the putative classes may object to the Guild's unionizing efforts, and because in the context of settlement negotiations, the Guild's unionizing efforts are adverse to the class goals of maximizing compensation.

In that we hold any conflict of interest has been waived, we need not address these arguments.

We note, however, that defendants may not create an actual conflict of interest by pointing to some unknown class member who *may* have a disagreement with the Guild's promotional activities. As discussed by amici curiae, accepting defendants' argument would mean that no labor organization or public interest organization, such as the AFL-CIO, National Rifle Association, the Sierra Club, or amici curiae, could fund litigation in which counsel with whom the organization had a relationship also represented a class, if any member of the class did not agree with a single, broader goal of the organization.

(ABA Model Rules Prof. Conduct, rule 1.7, com. [20]; see also *Gilbert v. National Corp., supra,* 71 Cal.App.4th at pp. 1251–1256.)

### d. *There were effective written waivers*

#### (1) *Plaintiffs and the Guild waived any conflict of interest*

Here, all plaintiffs, who were the named representatives of the putative classes, were fully aware of all conflicts, which they waived. Plaintiffs signed conflict waiver forms in which they acknowledged that the Guild was paying for the litigation. Plaintiffs knew that the Rothner firm represented the Guild. Plaintiffs were adamant that they would control the outcome of the litigation and would decide the outcome of the case. The Guild signed a conflict waiver acknowledging that it would not interfere with the independent judgment of plaintiffs' counsel and memorializing that plaintiffs, and not the Guild, controlled the litigation. Pursuant to court order, plaintiffs were informed that the proper goal of the litigation was not to facilitate the Guild's unionizing activities, and plaintiffs provided written consent acknowledging that they had been so informed. The Guild and plaintiffs provided written consent to the trial court's order.

Thus, all clients who were directly affected by any purported conflict, the Guild, and all plaintiffs, were fully apprised of any potential conflicts of interests, understood the role of the Rothner firm, the aim of the litigation, and who was to control the litigation. The clients (the Guild and plaintiffs) understood the relevant circumstance and the actual and foreseeable consequences of the Rothner firm's simultaneous representation of them. The written waivers demonstrated that the Guild and plaintiffs understood and acknowledged the presence of all purported conflicts of interests and the material risks of continued representation by the Rothner firm. Plaintiffs and the Guild made rational choices armed with full disclosures and provided informed written consent to the simultaneous representation by the Rothner firm.

#### (2) *Plaintiffs could provide the required waivers*

Defendants argue that the waivers by plaintiffs were inadequate. Defendants suggest each and every member of the two putative classes was required

to provide written consent to representation by the Rothner firm. This argument, which we examine de novo, is not persuasive for a number of reasons.

Defendants' argument ignores the procedural posture of the case. Plaintiffs have not filed motions to certify the classes and no classes have been certified. Thus, at this point in the litigation, the 21 plaintiffs represent themselves.

Further, obtaining consent from all absent class members prior to certification is impractical, as the names of the absent class members are most likely unknown. (See *Southern California Edison Co. v. Superior Court* (1972) 7 Cal.3d 832, 841, fn. 7 [103 Cal.Rptr. 709, 500 P.2d 621]; Hazard & Hodes, *supra,* § 11.12, p. 11-31 ["[I]t is unrealistic to speak of individual consultation with large numbers of class members and unrealistic to imagine that each client could give truly informed consent"].) Even after a class is certified, it is often impossible to ensure that every class member receives actual notice and thus notice to class members of a lawsuit needs only be reasonably calculated to reach absent class members (Cal. Rules of Court, rule 3.766(f); *Hypertouch, Inc. v. Superior Court* (2005) 128 Cal.App.4th 1527, 1545–1549 [27 Cal.Rptr.3d 839] [actual notice not required]).

Also, in actuality, defendants' argument is a request that we require all members of the class to opt in to the class action litigation. However, opt-in procedures conflict with California's class action procedures and inevitably are methods that permit a class action defendant to chip away at the size of a class. (*Hypertouch, Inc. v. Superior Court, supra,* 128 Cal.App.4th at pp. 1543–1550.) Were we to require a procedure by which each and every member of a class action lawsuit has to agree to the choice of class counsel, we would eviscerate the class action device that is designed to permit class members to sit back through the process, knowing there are safeguards for their protection. (*Id.* at p. 1539.)

■ Additionally, the class action procedures already include a system by which the court determines if the named class representatives can adequately represent the class. These procedures ensure that if there are conflict of interest issues, the representative plaintiffs are capable of providing informed consent on behalf of the class. The plaintiffs seeking certification have the burden to show that they can adequately represent the class by vigorously and tenaciously protecting the class members' interests. (*Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, 1104 [131 Cal.Rptr.2d 1, 63 P.3d

913]; *Simons v. Horowitz* (1984) 151 Cal.App.3d 834, 846 [199 Cal.Rptr. 134].) As part of this analysis, the trial court assesses the competency of class counsel, if the firm is representing the class as a whole and not simply the interests of the named representative plaintiffs (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 471 [174 Cal.Rptr. 515, 629 P.2d 23]; *Cal Pak Delivery, Inc. v. United Parcel Service, Inc.* (1997) 52 Cal.App.4th 1, 12–13 [60 Cal.Rptr.2d 207] (*Cal Pak Delivery*)), and if the named plaintiffs have lent their names to litigation that is controlled by class counsel. (*Howard Gunty Profit Sharing Plan v. Superior Court* (2001) 88 Cal.App.4th 572, 579–580 [105 Cal.Rptr.2d 896].) A person's class representative status may be defeated if there is a serious conflict among the members of the class that "goes to the very subject matter of the litigation . . . ." (*Richmond v. Dart Industries, Inc., supra,* at p. 470; see *Global Minerals & Metals Corp. v. Superior Court* (2003) 113 Cal.App.4th 836, 851 [7 Cal.Rptr.3d 28]; *J. P. Morgan & Co., Inc. v. Superior Court* (2003) 113 Cal.App.4th 195, 212–213 [6 Cal.Rptr.3d 214].)

Thus, when plaintiffs seek to have the classes certified, they will have the burden of meeting these requirements. At that time, if the trial court concludes that plaintiffs' motives for pursuing the lawsuits or their connection to the Guild make them incapable of providing informed written conflict waivers, then the trial court will not permit certification.

■ While California's Rules of Professional Conduct and case law have not directly addressed the issue presented here, permitting named class members to provide informed consent in class action lawsuits is consistent with the American Bar Association (ABA) Model Rules of Professional Conduct, which "may serve as guidelines absent on-point California authority or a conflicting state public policy [citation]." (*City and County of San Francisco v. Cobra Solutions, Inc., supra,* 38 Cal.4th at p. 852.) ABA Model Rules of Professional Conduct, rule 1.7 addresses conflict of interests between concurrent clients. Comment 25 authorizes the class representative to provide informed consent. ■ It reads: "When a lawyer represents or seeks to represent a class of plaintiffs or defendants in a class-action lawsuit, unnamed members of the class are ordinarily not considered to be clients of the lawyer for purposes of applying paragraph (a)(1) of this Rule [that restricts representation when there are concurrent conflicts of interest]. Thus, the lawyer does not typically need to get the consent of such a person before representing a client suing the person in an unrelated matter. Similarly, a lawyer seeking to represent an opponent in a class action does not typically need the consent of

an unnamed member of the class whom the lawyer represents in an unrelated matter." (ABA Model Rules Prof. Conduct, rule 1.7, com. [25].)

In the realm of class actions, the rules of disqualification cannot be applied so as to defeat the purpose of the class proceedings. (Cf. *Lazy Oil Co. v. Witco Corp.* (3d Cir. 1999) 166 F.3d 581, 589–590 [traditional rules of professional conduct cannot be applied mechanically in the realm of class actions].) Rather, the circumstances of each case must be evaluated.

The motion to disqualify here is not brought by one of the parties who may suffer because of a purported conflict, but by opposition parties who are not directly touched by the purported conflict. Disqualification of the Rothner firm may impose a significant hardship on plaintiffs, who will bear the burden of finding replacement counsel with the skills and knowledge of the Rothner firm, a firm that already has expended more than 1,000 hours on the case, including the review of more than 8,000 pages of documents over seven months. (Cf. *McPhearson v. Michaels Co.* (2002) 96 Cal.App.4th 843, 849–850 [117 Cal.Rptr.2d 489].) As such, we must be skeptical of the impetus and purpose of defendants' motion to disqualify the Rothner firm because it poses the very threat to the integrity of the judicial process that it purports to prevent. Such motions "can be used to harass opposing counsel, to delay the litigation, to intimidate an adversary into accepting settlement on otherwise unacceptable terms, or for other strategic purposes. [Citation.]" (*Ibid.*; accord, *Zador Corp. v. Kwan, supra*, 31 Cal.App.4th 1285; cf. *McPhearson v. Michaels Co., supra*, at pp. 849–850 [generally conflicts may be waived by persons personally interested and courts must be skeptical when disqualification motions are brought by opposing parties].)

Lastly, we cannot ignore the public interest consequences of permitting the disqualification of the Rothner firm at this point in the litigation. "It is the policy of this state to vigorously enforce minimum labor standards in order to ensure employees are not required or permitted to work under substandard unlawful conditions . . . and to protect employers who comply with the law from those who attempt to gain a competitive advantage at the expense of their workers by failing to comply with minimum labor standards." (Lab. Code, § 90.5.) Constitutional rights of association, speech, and assembly permit unions to provide, and assist in obtaining, legal services for their members. (*United Transportation Union v. Michigan Bar* (1971) 401 U.S. 576 [28 L.Ed.2d 339, 91 S.Ct. 1076]; *Mine Workers v. Illinois Bar Assn.* (1967) 389 U.S. 217 [19 L.Ed.2d 426, 88 S.Ct. 353]; *Railroad Trainmen v. Virginia Bar* (1964) 377 U.S. 1 [12 L.Ed.2d 89, 84 S.Ct. 1113]; cf. *Frye v. Tenderloin Housing Clinic, Inc.* (2006) 38 Cal.4th 23, 39 [40

Cal.Rptr.3d 221, 129 P.3d 408] ["The First Amendment protects the associational and expressive rights of persons—both lawyers and nonlawyers—to join together to employ litigation to seek redress of grievances."].)

Wage and hour litigation is often financed by labor unions to support their members and members of the public because employees often lack the resources to do so. Such litigation is designed to protect all workers, including members of the union and nonmembers. (E.g., *Shaffer v. Farm Fresh, Inc.* (4th Cir. 1992) 966 F.2d 142; *Aguiar v. Cintas Corp. No. 2* (2006) 144 Cal.App.4th 121, 125 [50 Cal.Rptr.3d 135]; cf. *Gentry v. Superior Court* (2007) 42 Cal.4th 443 [64 Cal.Rptr.3d 773, 165 P.3d 556] [recognizing that class actions play important role in enforcing labor laws].) To deny these employees access to attorneys knowledgeable in labor law based upon an objection filed by their employer, when the named representatives of the class action lawsuit and the union have waived all conflicts and the motion is brought before class certification is sought will provide a tactical edge to the employer at the expense of the putative class. It will also preclude attorneys from representing union members if the attorneys have assisted the union in prelitigation activities. (See *McClendon v. Continental Group, Inc.* (D.N.J. 1986) 113 F.R.D. 39, 42–43 [union funding does not make interest of named parties antagonistic to interests of class].)[10] The California Rules of Professional Responsibility cannot be construed so as to prohibit this type of advocacy. Further, they cannot be construed so as to hurt class members, under the guise of protecting them.

We cannot assume that the Rothner firm will fail to abide by its ethical obligations and there is no evidence that it will subvert the interests of one of its clients, plaintiffs and members of the putative class, for those of its other client, the Guild. (Compare *Shaffer v. Farm Fresh, Inc., supra,* 966 F.2d 142 [opt-in case under the federal Fair Labor Standards Act of 1938 funded by union; union's primary outside counsel acted as counsel for the class; under Virginia Rules of Professional Conduct, circuit court reversed a disqualification order holding it was based upon speculation that attorneys would subvert the clients' interests for those of the union] with *Kamean v. Local 363, Intern. Broth. of Teamsters* (S.D.N.Y. 1986) 109 F.R.D. 391 [named plaintiffs and

---

[10] Cf. *Barton v. Albertson's Inc.* (D.Idaho, Dec. 23, 1997, Civ. No. 97-0159-S-BLW) 1997 U.S.Dist. Lexis 22577, at pages *14–*15 (disqualification motion denied in opt-in case under the federal Fair Labor Standards Act of 1938 (29 U.S.C. § 201 et seq.) funded by the union; firm's representation of union did not conflict with its representation of individual plaintiffs in case; but Idaho's Rules of Professional Conduct require each plaintiff to provide consent to the representation).

counsel are disqualified where litigation was designed by opposing union to dismantle the very class plaintiffs purportedly were acting to assist].)

 As stated above, the focus of disqualification motions must be on the preservation of public trust in the scrupulous administration of justice and the integrity of the bar. Thus, in exercising its inherent authority, a trial court may, at times, decline to accept a client's proffered waiver. (E.g., *People v. Baylis, supra*, 139 Cal.App.4th at p. 1069 [where criminal court is confronted with actual conflict that may affect integrity of the proceedings, court is not obligated to accept as adequate a conflict waiver]; *In re A.C.* (2000) 80 Cal.App.4th 994, 1002 [96 Cal.Rptr.2d 79] [conflict not waivable where father, an attorney, pleads nolo contendere to molesting his daughters, and three daughters waive conflict of interest to permit father to represent them in petition to destroy juvenile records and eliminate references to them in juvenile file of another sibling]; *Tsakos Shipping & Trading, S.A. v. Juniper Garden Town Homes, Ltd.* (1993) 12 Cal.App.4th 74, 97 [15 Cal.Rptr.2d 585] [where there is an actual conflict, party may not consent to dual representation of conflicting interests at trial].) Consent cannot cure a conflict where "it is not reasonably likely that the lawyer will be able to provide adequate representation to one or more of the clients." (Rest.3d Law Governing Lawyers, *supra*, § 122, p. 264; see also Hazard & Hodes, *supra*, § 10.8, p. 10-23.) This is not one of those cases.

e. *The cases relied upon by defendants do not alter our conclusion*

Defendants rely on a trio of cases all making the statement that "Unidentified class members cannot waive a potential conflict of interest." This statement originated in *Palumbo v. Tele-Communications, Inc.* (D.D.C. 1994) 157 F.R.D. 129 at page 133 *(Palumbo)*. Thereafter, it was quoted in *Cal Pak Delivery, supra*, 52 Cal.App.4th 1, and finally, without proper attribution, it was quoted in *Apple Computer, supra*, 126 Cal.App.4th 1253. However, at most, these three cases hold that courts properly disqualify counsel when there are irreconcilable conflicts of interests. These authorities do not mandate that all conflict waivers must be from each and every member of a class.

In *Palumbo,* an attorney obtained an ownership interest and a seat on the board of the defendant's affiliate upon resolving a race discrimination case. *(Palumbo, supra,* 157 F.R.D. at pp. 131–132.) Thereafter, the same attorney brought a class action race discrimination lawsuit against the defendant. *Palumbo* held that the attorney could not act as class counsel. In so holding, the court stated, that "by bringing a class action lawsuit against [the defendant] alleging misdeeds by [the defendant's affiliates, plaintiff] is essentially suing himself." *(Id.* at p. 132.) The court also stated, "The fact that [counsel]

seek[s] to represent a national class of plaintiffs makes the decision to disqualify even more compelling. If [he] were representing only an individual plaintiff, he could conceivably seek a written waiver of conflict of interest. But in this case, [he] seeks to represent a large, unenumerated and as yet unidentified class of plaintiffs. Unidentified class members cannot waive a potential conflict of interest." (*Id.* at pp. 132–133.)

*Cal Pak Delivery, supra,* 52 Cal.App.4th 1, involved a situation in which an attorney represented one named plaintiff, his client Cal Pak Delivery, in an action styled as a class action lawsuit against the United Postal Service. The attorney offered to sell out Cal Pak Delivery, the sole class representative, as well as all putative class members by offering to accept a personal payment of $8 to $10 million in exchange for dismissing the lawsuit, with the purported class taking nothing. (*Id.* at pp. 5–6.) The appellate court stated that although counsel's actions "did not involve the misuse of confidential information, nor directly prejudice adverse parties, it was nonetheless *more* inimical to the interests of those he ostensibly represented." (*Id.* at p. 11.) The attorney breached his fiduciary duties and his duty of loyalty. (*Ibid.*) *Cal Pak Delivery* clearly was correct in upholding the order disqualifying counsel, as it would have been abhorrent to permit class counsel to remain in that role after he tried to sell out the class for personal gain. However, in discussing the issues, *Cal Pak Delivery* threw into the discussion a long quotation from *Palumbo, supra,* 157 F.R.D. at pages 132–133, which included the sentence " 'Unidentified class members cannot waive a potential conflict of interest.' " (*Cal Pak Delivery, supra,* at p. 12.)

In *Apple Computer, supra,* 126 Cal.App.4th 1253, an attorney was the sole named plaintiff in a class action brought under Business and Professions Code section 17200 (the unfair competition law; UCL). The attorney's law firm and cocounsel represented the class. Cocounsel also served in a number of other cases, all brought under the UCL. (*Apple Computer, supra,* at pp. 1261–1263.) *Apple Computer* held that both law firms should be disqualified because their interest in the litigation was to maximize litigation fees at the expense of class members. *Apple Computer* noted that the attorney fees would dwarf the $8 the individual members of the class could reap and there was concern that the litigation was manufactured solely to produce attorney fees. (*Id.* at pp. 1264–1274.) Further, cocounsel should also be disqualified because it had a financially interdependent relationship with the attorney's firm. (*Id.* at pp. 1274–1279.) Here, defendants rely upon footnote 7 of *Apple Computer* that stated: "Assuming that this type of conflict could be waived by a client (see *Flatt v. Superior Court, supra,* 9 Cal.4th at p. 285, fn. 4), a waiver is not possible in this case. 'Unidentified class members cannot waive a potential conflict of interest.' (*Cal Pak Delivery, Inc. v. United Parcel Service, Inc., supra,* 52 Cal.App.4th at p. 12.)" (*Apple Computer, supra,* at p. 1274, fn. 7.) By this citation, *Apple Computer* failed to recognize that *Cal Pak Delivery*

had taken the quote from *Palumbo*. Further, *Apple Computer*'s holding makes the footnote dicta. In *Apple Computer*, the lawsuits were not designed to benefit the class members. Rather, the plaintiff attorney and his law firm manufactured class action lawsuits for their own pecuniary gain.

Thus, the holdings in *Palumbo, supra,* 157 F.R.D. 129, *Cal Pak Delivery, supra,* 52 Cal.App.4th 1, and *Apple Computer, supra,* 126 Cal.App.4th 1253, were not based on whether or not all members of a class are mandated to waive a conflict of interest. Rather, the holding in each of these three cases rested upon the fact that there were irreconcilable conflicts.

The last case cited by defendants is *Chateau De Ville Productions v. Tams-Witmark Music* (S.D.N.Y. 1979) 474 F.Supp. 223 (*Chateau*). This case also involved an irreconcilable conflict of interest. In *Chateau,* the plaintiff's counsel concurrently represented the defendant's alleged coconspirator in an antitrust action which sought to nullify contracts between the coconspirators. (*Id.* at p. 226.) *Chateau* held that the counsel could not represent both the plaintiff and the defendants' coconspirator. (*Id.* at p. 227.) It found insufficient evidence of a conflict waiver (*id.* at pp. 226–227 & fn. 5) and in dicta the court stated, "[m]oreover, since plaintiffs still seek to proceed on behalf of a class, the consent of all would be required and this, of course, is not a practical possibility." (*Id.* at p. 227.)

None of the cases relied upon by defendants convince us that each member of the two classes involved in these two related class action lawsuits must provide written consent to representation by the Rothner firm.

 The trial court did not abuse its discretion in refusing to disqualify the entire Rothner firm.[11]

---

[11] Here, the trial court established an ethical wall or ethical screen prohibiting Attorney Segall from communicating with other members of his firm and plaintiffs with regard to the litigation, other than with regard to attorney fees and costs of the litigation. In light of our holding that there were effective conflict waivers, we need not address whether the trial court erred in establishing the ethical wall. These parts of the August 9 and 11, 2006, orders are still in force because plaintiffs did not object to the ethical wall in their cross-appeal. Currently, in the context of private law firms, there is no definitive California authority authorizing ethical walls. (1 Vapnek et al., Cal. Practice Guide: Professional Responsibility, *supra,* ¶ 4:204.4, p. 4-60.18 ["Thus far, the court-approved use of screening procedures to avoid conflict-based disqualification has been limited to situations involving attorneys moving into or out of the public sector (e.g., former judge into private practice, former private attorney into public sector)"].) The California Supreme Court has recently granted review in *In re Charlisse C.* (2007) 149 Cal.App.4th 1554 [58 Cal.Rptr.3d 173], review granted July 18, 2007, S152822, to address the standard to control disqualification of counsel from legal service agencies and public law firms in juvenile dependency proceedings due to successive representation of clients with potentially conflicting interests.

2. *The denial of the motion to disqualify all representative plaintiffs*

Defendants also contend that the trial court erred in refusing to disqualify all plaintiffs from acting as representatives of the putative classes. This contention is unpersuasive.[12]

"To obtain certification [of a class action], a party must establish the existence of both an ascertainable class and a well-defined community of interest among the class members. [Citations.]" (*Linder v. Thrifty Oil Co., supra,* 23 Cal.4th at p. 435.) The "community of interest" requirement has three factors, one of which is that the plaintiff must be able to adequately represent the class. (*Ibid.*; *Lockheed Martin Corp. v. Superior Court, supra,* 29 Cal.4th at p. 1104.) The representative's personal claims cannot be " 'inconsistent with the claims of other members of the class. [Citation.]' [Citation.]" (*J. P. Morgan & Co., Inc. v. Superior Court, supra,* 113 Cal.App.4th at p. 212.) As stated above, a person will be denied representative status if there is a serious conflict among the members of the class that "goes to the very subject matter of the litigation . . . ." (*Richmond v. Dart Industries, Inc., supra,* 29 Cal.3d at p. 470.) When certification of a class is sought, the named representatives must establish that the two requirements are met.

Here, however, defendants preemptively raised the issue of plaintiffs' qualification to serve as representative parties. Defendants' disqualification motion was an end run around the certification procedures and an attempt to deny plaintiffs the ability to present their case. When plaintiffs seek to certify the classes, they will have the burden to prove that they can adequately represent the classes as defined in the two class action lawsuits. At this stage of the proceeding, the issue is premature. Plaintiffs are only representing themselves.[13]

---

[12] We have reviewed the trial court's order denying defendants' request to disqualify all representative parties as an intermediate ruling that affects the rights of a party. (Code Civ. Proc., §§ 906, 904.1, subd. (a)(6).) We note that generally orders certifying a class, which inherently reject a defendant's argument that named plaintiffs are not adequate representatives, are not immediately appealable. However, the denial of a certification motion is appealable. (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435–436 [97 Cal.Rptr.2d 179, 2 P.3d 27]; *Estrada v. RPS, Inc.* (2005) 125 Cal.App.4th 976, 986 [23 Cal.Rptr.3d 261]; *Shelley v. City of Los Angeles* (1995) 36 Cal.App.4th 692, 695–696 [42 Cal.Rptr.2d 529].)

[13] If this were an appeal from a certification order, we would "review the trial court's ruling for abuse of discretion. 'Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification. . . . [Accordingly,] a trial court ruling supported by substantial evidence generally will not be disturbed "unless (1) improper criteria were used [citation]; or (2) erroneous legal assumptions were made [citation]" [citation]. . . . "Any valid pertinent reason stated will be sufficient to uphold the order." ' [Citations.]" (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326–327 [17 Cal.Rptr.3d 906, 96 P.3d 194].)

Further, even if the issue could be addressed at this time, it would be inappropriate to do so. The only information known about those plaintiffs who were not removed from their roles as representatives of the classes is that most attended meetings of the Guild's organizing committee and that those who attended the meetings might support the Guild's organizing efforts. To suggest that these facts disqualify plaintiffs from being class representatives is pure speculation.

We deny defendants' request to remove the other 17 plaintiffs from their representative capacities.[14]

B. *The cross-appeal by plaintiffs*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

IV.

DISPOSITION

The appeal and cross-appeal as to *Sharp v. Next Entertainment Inc.* (Super. Ct. L.A. County, 2006, No. BC336170) are dismissed.

The written orders of August 9, and 11, 2006, denying defendants' motion to disqualify the entire Rothner firm and denying defendants' motion to disqualify all named plaintiffs from acting as representatives of the putative class are affirmed insofar as they relate to *Shriver v. Rocket Science Laboratories* (Super. Ct. L.A. County, No. BC338746).

The verbal order of August 9, 2006, and the written order of October 11, 2006, requiring Attorney Leheny to ask questions relating to plaintiffs' association with the Guild are reversed insofar as the orders relate to *Shriver v. Rocket Science Laboratories* (Super. Ct. L.A. County, 2006, No. BC338746).

---

[14] Sharp and DeVolld were removed from their representative roles in *Sharp v. Next Entertainment Inc.* (Super. Ct. L.A. County 2006, No. BC336170). Shriver and Seyyid were removed from their representative roles in *Shriver v. Rocket Science Laboratories* (Super. Ct. L.A. County, 2006, No. BC338746). These four plaintiffs did not appeal from that part of the order disqualifying them from acting as class representatives. Thus, our disposition does not affect the trial court's removal order. Because the appeal has been dismissed as to Sharp and DeVolld, they are no longer before us. As we explained earlier, we have continued to address them for purposes of simplicity and continuity. (See fn. 6, *ante.*)

[*] See footnote, *ante*, page 410.

The plaintiffs in *Shriver v. Rocket Science Laboratories* (Super. Ct. L.A. County, 2006, No. BC338746) are awarded all costs on appeal.

Croskey, Acting P. J., and Kitching, J., concurred.