Filed 12/3/24  Mendoza v. West Coast Quartz Corporation CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

|  |  |
|---|---|
| LUIS MENDOZA,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>WEST COAST QUARTZ<br>CORPORATION,<br><br>　　　Defendant and Appellant. | A170409<br><br>(Alameda County<br>Super. Ct. No. RG18927787) |

　　　This is a wage and hour class action and Labor Code Private Attorneys General Act of 2004 (PAGA) (Lab. Code, § 2698 et seq.) lawsuit by Luis Mendoza against West Coast Quartz Corporation (WCQ).  After the trial court certified a class and subclasses of nonexempt WCQ employees (including nonexempt supervisory-level employees), WCQ moved to disqualify class counsel, Capstone Law APC (Capstone), arguing the firm had a conflict of interest in representing both supervisory and nonsupervisory class members.  On appeal, WCQ contends the trial court abused its discretion in refusing to disqualify Capstone because counsel's loyalty is impermissibly divided between the directly adverse interests of the supervisory and nonsupervisory class members.  We affirm.

1

## FACTUAL AND PROCEDURAL BACKGROUND

WCQ manufactures and distributes silicon parts for the semiconductor industry. It has approximately 300 nonexempt employees.[1]

In November 2018, Mendoza filed a putative class action lawsuit against WCQ asserting claims under the Labor Code and Unfair Competition Law (Bus. & Prof. Code, § 17200). Mendoza thereafter filed amended complaints asserting additional Labor Code violations and a claim for civil penalties under PAGA. The operative second amended complaint alleges, among other things, claims for unpaid overtime, unpaid minimum wages, failure to provide meal periods, failure to authorize and permit rest periods, noncompliant wage statements and failure to maintain payroll records,

---

[1] Employers in the manufacturing industry are covered by Industrial Welfare Commission wage order No. 1-2001 (Cal. Code Regs., tit. 8, § 11010), which requires employers to relieve nonexempt employees for at least one meal period for shifts over five hours (*id.*, subd. 11(A)) and to record having done so (*id.*, subd. 7(A)(3)). (See also Lab. Code, §§ 226.7 [meal and rest periods], 512 [meal periods]; further unspecified statutory references are to this code.) Employees are also entitled to a 10-minute paid rest break per four hours of work. (Cal. Code Regs., tit. 8, § 11010, subd. (12)(A).) To provide compliant breaks, the employer must "relieve[] its employees of all duty, relinquish[] control over their activities and permit[]them a reasonable opportunity to take an uninterrupted . . . break." (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1040 (*Brinker*).)

" 'If an employer's records show no meal period for a given shift over five hours, a rebuttable presumption arises that the employee was not relieved of duty and no meal period was provided.' " (*Donohue v. AMN Services, LLC* (2021) 11 Cal.5th 58, 74, citing *Brinker*, at p. 1053, conc. opn. of Werdegar, J.) "If the employer fails to provide a required meal period or rest break, it must compensate the employee with a 'premium'—an additional hour of pay for each workday during which a violation occurred." (*Arce v. The Ensign Group* (2023) 96 Cal.App.5th 622, 629.) And because missed-break premium pay constitutes wages, "it can support section 203 waiting time penalties and section 226 wage statement penalties." (*Naranjo v. Spectrum Security Services, Inc.* (2022) 13 Cal.5th 93, 125.)

wages not timely paid upon termination, and unreimbursed business expenses.

**A. Class Certification**

In November 2022, the trial court granted Mendoza's motion to certify a class of all nonexempt, hourly employees of WCQ at its three California locations from four years prior to the filing of the original complaint to the date of certification. The court also certified six subclasses: (1) a meal period policy subclass for employees who worked at least one shift of five hours or more through September 28, 2020; (2) a meal break premium subclass of employees who worked at least one shift of more than five hours through September 28, 2020; (3) an on-premises rest break subclass for employees who worked at least one shift of more than 3.5 hours through September 28, 2020; (4) a wage statement meal premium subclass for class members who received at least one meal period premium payment from November 17, 2017 to the date of class certification; (5) a waiting time subclass from November 7, 2015 to the date of certification; and (6) a derivative wage statement subclass from November 17, 2017 to the date of certification.

For the meal period policy subclass, the trial court found that WCQ had a written meal policy stating " 'employees must take their first break within 6 hours of their start time.' " The court noted that WCQ employees were required to sign a " 'time keeping standard' " that included this same language, and that the policy remained in effect until September 28, 2020, when it "was changed in response to this lawsuit to state the break should be taken within the fifth hour." The court rejected WCQ's contention that the policy "was merely a guideline and that each supervisor set his own meal schedule," concluding "[t]he evidence suggests the contrary."

3

The trial court further concluded that WCQ's written meal policy "was not consistent with well-established law that requires meal[] breaks within the first five hours of the shift." The court credited the declaration of Mendoza's statistical expert, Dr. Robert Fountain, who analyzed WCQ's payroll records and found that 312 employees worked over 163,000 shifts of over five hours in duration, and that of these, 281 employees worked 87,510 shifts of over five hours where "the time punch for the first meal period was taken after the fifth hour of work," reflecting a 53.4 percent rate of late meal breaks. The court concluded the evidence established a rebuttable presumption of widespread noncompliant meal breaks, and that WCQ failed to "offer any systematic, admissible evidence indicating that employees were paid for non-compliant meal breaks. . . . [T]he evidence shows few meal premiums were paid prior to 2020. Nor does [WCQ] offer significant admissible evidence that employees waived compliant breaks or sought late breaks prior to 2021."

For the on-premises rest break subclass, the trial court relied on WCQ's written policy, in effect from November 7, 2014 through September 28, 2020, which stated that employees must remain on the premises during their breaks. For the wage statement subclass, the court noted it was undisputed the class members' wage statements did not separately list meal period premiums paid, but rather incorporated them into the total regular hours listed on the statement.

In granting certification, the trial court rejected WCQ's claim of a conflict among class members because some of them "had supervisory duties as 'People Leaders' and as such created and enforced break schedules." The court found WCQ provided no evidence that "nonexempt supervisors have any role in setting company policy or granting premiums or determining the

4

content of wage statements."  Thus, the court concluded WCQ "has not shown a significant conflict 'that goes to the very subject matter of the litigation.' "

Following certification, class notice was provided to 319 employees, 14 of whom opted out, resulting in a class of 305 members, with Mendoza as the class representative.[2]

**B. First Disqualification Motion**

In October 2023, WCQ filed its first motion to disqualify Capstone, arguing the firm's representation of both supervisory and nonsupervisory class members created a conflict of interest.  In opposition, Mendoza argued that WCQ improperly sought reconsideration of the class certification ruling; WCQ lacked standing to assert this conflict; and even if WCQ had standing, the motion lacked merit because the class claims relied entirely on break policies created by WCQ management, not the decisions of supervisory class members.

The trial court denied the motion without prejudice for several reasons. First, the court reiterated its prior finding that "there is no 'evidence that nonexempt supervisors have any role in setting company policy or granting premiums or determining the content of wage statements.' [Citations.] [WCQ] cites the same evidence in this Motion as it did at certification."  The court further found that " '[w]atching' schedules and 'making sure' people take breaks on time is different from 'creating' " the meal and rest break policies at issue in the case.  The court concluded that WCQ's "fill-in-the-blank" declarations of four class members (Eddy Lee, Jose Vargas, Parveen Pal, and Virgilio Presa) had "limited evidentiary value" and "[ran] counter to

_____

[2]    The trial court later granted, in part, WCQ's motion to compel arbitration against six class members and ordered that these individuals be excluded from the certified class.

5

Defendant's position," as they each stated that they would " 'consider 'WCQ's guidelines' " and not their own preferences in scheduling breaks. The court concluded that any asserted conflict remained hypothetical and speculative.

### C. Renewed Disqualification Motion

In April 2024, WCQ filed a renewed motion to disqualify Capstone. Incorporating the arguments from its prior motion, WCQ again argued there were "impossible opposing interests of supervisor class members" within the certified class. (Boldface and capitalization omitted.) This time, WCQ based its arguments on evidence that certain supervisory class members were opposed to the action, and that Capstone had "vicious[ly]" cross-examined some of them in deposition.

The supporting evidence included a handwritten letter by supervisory class member Presa opining that "[t]he case is [a] lie" and expressing concerns about the conduct of class counsel during Presa's deposition. WCQ also submitted excerpts from deposition transcripts in which supervisory class members testified that Mendoza's key allegations in his declaration were untrue. WCQ further maintained that a Capstone attorney had "exposed class member John Yasa's questionable meal practices" during his deposition, causing Yasa to suffer "emotional trauma" and to file an ethics complaint with the state bar against the attorney.

The trial court denied the motion, finding "no disqualifying conflict." The court explained, "[WCQ] argues that the supervisor's job duties included enforcement of break policies, meaning that class counsel 'would have to impeach' the supervisor class members in order to provide the class claims. [Citation.] Not so." [¶] "While [WCQ's] defense appears to be that the 'supervisor' class members are responsible for break policies, the court certified the classes based on [WCQ's] 'express policy and statistical

6

evidence.' [Citations.] Thus, there is no disqualifying conflict or inconsistency between the class's theory of liability and [WCQ's] defense." Furthermore, even though certain class members contradicted Mendoza's allegations, the court concluded "this conflict in evidence does not give rise to a disqualifying conflict between class members and class counsel," as certification was based upon written policies and statistical evidence, and "class counsel does not need to disprove contradictory testimony in order to prosecute class claims."

Additionally, the trial court ruled that WCQ lacked standing to assert a breach of Capstone's duty of loyalty to the class or to object to Capstone's questioning of class members at deposition. Noting that WCQ's claim of standing was based on its desire to "avoid[] a trial," the court concluded this was insufficient to create standing and suggested the motion was being "used to gain tactical advantage."

## DISCUSSION

"Disqualification motions implicate several important interests, among them are the clients' right to counsel of their choice, the attorney's interest in representing a client, the financial burden of replacing a disqualified attorney, and tactical abuse that may underlie the motion. [Citation.] The 'paramount' concern in determining whether counsel should be disqualified is 'the preservation of public trust in the scrupulous administration of justice and the integrity of the bar.' " (*Roush v. Seagate Technology, LLC* (2007) 150 Cal.App.4th 210, 218–219.) Disqualification motions are uniquely " 'prone to tactical abuse because disqualification imposes heavy burdens on both the clients and courts; clients are deprived of their chosen counsel, litigation costs inevitably increase and delays inevitably occur. As a result, these motions must be examined "carefully to ensure that literalism does not deny the

7

parties substantial justice." ' " (*Sharp v. Next Entertainment, Inc.* (2008) 163 Cal.App.4th 410, 424–425 (*Sharp*).) " '[S]peculative contentions of conflict of interest cannot justify disqualification of counsel.' " (*In re Jasmine S.* (2007) 153 Cal.App.4th 835, 845.)

We review an order granting or denying a disqualification motion for abuse of discretion, and we will reverse the trial court's decision "only when there is no reasonable basis" for it, accepting as correct the court's express or implied findings that are supported by substantial evidence. (*Costello v. Buckley* (2016) 245 Cal.App.4th 748, 752–753.)

The challenge here is to representation by counsel that is concurrent, as opposed to successive. "The 'primary value' at issue in concurrent 'or dual representation is the attorney's duty—and the client's legitimate expectation—of *loyalty*.' [Citation.] 'The most egregious conflict of interest is representation of clients whose interests are directly adverse in the same litigation. [Citation.] Such patently improper dual representation suggests to the clients—and to the public at large—that the attorney is completely indifferent to the duty of loyalty.' " (*Walker v. Apple, Inc.* (2016) 4 Cal.App.5th 1098, 1106 (*Walker*).)

WCQ maintains that Capstone's concurrent representation of supervisory and nonsupervisory class members should not be countenanced because its loyalty is impermissibly divided between the interests of the two groups. Importantly however, in the context of class actions, the general rules of disqualification " 'cannot be applied [mechanically] so as to defeat the purpose of the class proceedings.' [Citation.] 'Rather, the circumstances of each case must be evaluated.' " (*Walker*, *supra*, 4 Cal.App.5th at p. 1107, citing *Sharp*, *supra*, 163 Cal.App.4th at p. 434; see also *Radcliffe v. Hernandez* (9th Cir. 2016) 818 F.3d 537, 547 ["California law does not require

8

automatic disqualification for simultaneous conflicts of interest in class actions"].) Indeed, where, as here, a motion to disqualify class counsel is brought by "opposition parties who are not directly touched by the purported conflict," courts "must be skeptical of the impetus and purpose of [the] defendants' motion . . . because it poses the very threat to the integrity of the judicial process that it purports to prevent." (*Sharp*, at p. 434.) Such motions "can be used to harass opposing counsel, to delay the litigation, to intimidate an adversary into accepting settlement on otherwise unacceptable terms, or for other strategic purposes." (*Ibid.*)

In light of these authorities, and mindful of the potential for tactical abuse in defense motions to disqualify class counsel, we turn our attention to the particular circumstances of this case. We begin with the operative complaint, which alleges that both supervisory and nonsupervisory class members were nonexempt employees of WCQ subject to the same uniform policy regarding meal and rest breaks, and that they were denied legal meal and rest breaks, related premium payments, and legally compliant wage statements. As far as these claims are concerned, there is no adversity between the interests of the supervisory and nonsupervisory class members that would divide class counsel's loyalty in seeking relief for WCQ's alleged wage and hour violations.

That the class consists of nonexempt employees at different levels of authority does not, by itself, signal that Capstone's loyalty is divided. In this regard, we observe federal courts have held that class counsel is not impermissibly conflicted due to the mere fact that "the class cuts across levels of authority in a company, with some class members supervising other class members." (*Blackwell v. Skywest Airlines* (S.D. Cal. 2007) 245 F.R.D. 453, 464; see *Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.* (C.D. Cal. 2015)

9

311 F.R.D. 590, 606 (*Moore*).)  Like the federal courts, we decline to recognize a per se rule against including employees at different levels of an employment hierarchy in the same class.  (See *ibid.*)[3]

WCQ still insists that Capstone is conflicted because it will likely have to cross-examine and attack the job performance of the supervisory class members due to their responsibility for scheduling the breaks of the nonsupervisory class members.  In support, WCQ relies on *Walker*, which affirmed the disqualification of a law firm representing employees of Apple, Inc. (Apple) in two separate wage and hour class actions, one for meal and rest break violations, and the other for failure to provide final wage statements upon termination.  (*Walker*, *supra*, 4 Cal.App.5th at pp. 1102–1103.)

In *Walker*, one of Apple's employees (Meg Karn) was a class member in the first class action at the time of certification, but she had since been promoted to store manager and was responsible for the final wage statements of the named plaintiffs (Walkers) in the second class action.  (*Walker*, *supra*, 4 Cal.App.5th at p. 1104.)  In affirming the grant of Apple's motion to disqualify class counsel in the second class action, the Court of Appeal concluded there was substantial evidence that under the particular circumstances of the case, the interests of the Walkers and Karn were adverse.  (*Id.* at pp. 1104–1105, 1111.)  Specifically, it was "not merely hypothetical or speculative that Karn will eventually testify in some capacity during this case," which might put Karn's employment prospects in jeopardy. (*Id.* at p. 1111.)  As *Walker* explained, it was "unseemly" and violative of the

---

[3]     "Where California courts have not addressed an issue, they look to federal cases as persuasive authority on class action questions."  (*Collins v. Safeway Stores, Inc.* (1986) 187 Cal.App.3d 62, 73, fn. 6.)

law firm's duty of loyalty to force its own client into a "Hobson's choice" of having to either contradict her employer's class action litigation strategy or give testimony that undermines her employer's confidence in her job performance in order to benefit the firm's other clients. (*Id.*, at pp. 1111–1112.)

Critical to *Walker*'s holding were two specific rulings of the trial court. First, "[t]he court rejected the Walkers' argument that 'it is Apple's company-wide policies and practices that form the basis of Plaintiff's claims.' " (*Walker, supra*, 4 Cal.App.5th at p. 1105.) Second and relatedly, the court found it "undisputed" that store manager Karn was responsible for providing timely final wage statements to the Walkers. (*Ibid*.) In stark contrast, the trial court here found that the basis for Mendoza's meal and rest break claims was WCQ's uniform break policies, and that the supervisory class members played no part in creating these policies. These findings were supported by substantial evidence, which included the written policies themselves; the deposition testimony of WCQ's director of human resources that he, with the assistance of counsel, created the applicable wage and hour policies for the company; the deposition testimony of supervisory class members that they simply adhered to the company's break policies; and Dr. Fountain's analysis of clock punch records that tended to show WCQ's break policies more often than not resulted in untimely meal breaks.

Even if the evidence suggests supervisory class members helped to implement the challenged policies, we are not convinced the trial court abused its discretion in finding no disqualifying conflict. Liability against WCQ is still premised on the predominant effect of the company's written policies on all the class members. (See, e.g., *Moore, supra*, 311 F.R.D. at p. 606 [no conflict among putative class of nonsupervisory and supervisory

11

employees subject to a policy causing them to undergo and perform exit inspections where "all the employees, regardless of position, will be owed compensation" in the event of a successful action].) Even assuming WCQ elects to call individual supervisory class members to the stand at trial, an unseemly cross-examination of their job performance is not a foregone conclusion. Class counsel may instead establish, through the other evidence discussed above, that the wage and hour violations were primarily the result of the uniform policies created and handed down by WCQ management. In sum, *Walker* is materially distinguishable, and the trial court could reasonably conclude, based on substantial evidence in the record, that disqualification of Capstone was not required.[4]

We acknowledge the record reflects a degree of tension between class counsel and some supervisory class members, including instances in which the class members accused Capstone of fabricating the allegations of the lawsuit or expressed confusion about whether Capstone was representing them.[5] But importantly, the salient question for disqualification purposes is whether the concurrently represented clients have "directly adverse

---

[4] In light of our conclusion, we need not address whether WCQ had standing to move for disqualification.

[5] WCQ goes so far as to suggest Capstone is subject to disbarment under Business and Professions Code section 6106 for the alleged fabrication. Mendoza meanwhile accuses WCQ and its counsel of improperly communicating with, influencing, and "taint[ing]" the testimony of the supervisory class members in order to create tension between them and class counsel. We need not delve into these accusations in order to decide this appeal, and we echo the trial court's admonition that " 'zealous advocacy does not equate with "attack dog" or "scorched earth"; nor does it mean lack of civility. [Citations.] Zeal and vigor in the representation of clients are commendable. So are civility, courtesy, and cooperation. They are not mutually exclusive.' " (*Findelton v. Coyote Valley Band of Pomo Indians* (2021) 69 Cal.App.5th 736, 763.)

interests" in the litigation (*Sharp, supra*, 163 Cal.App.4th at p. 428), not simply differing opinions about counsel's legal strategies, theories, and competence (see *Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 475 [no fundamental conflict simply because class members disagree as to proper theory of liability]; cf. *Drennan v. PNC Bank, NA (In re Comty. Bank of N. Va. & Guaranty Nat'l Bank of Tallahassee Second Mortg. Loan Litig.)* (3d Cir. 2010) 622 F.3d 275, 305 [mere disagreement over litigation strategy does not establish inadequacy of class counsel's representation for purposes of disapproving class action settlement or permitting objectors to intervene]). After all, if Mendoza prevails, the class members who have doubts about the litigation still stand to obtain the same relief as those who support it; conversely, the supervisory class members will obtain no direct benefit from the lawsuit's defeat.  But even if certain supervisory class members felt attacked or confused by Capstone's questioning during their depositions, WCQ did not establish that the interests of the supervisory class members as a whole are directly adverse to those of the nonsupervisory class members such that Capstone cannot maintain undivided loyalty in seeking to recover against WCQ based on its company-wide policies and practices.

WCQ further submits that during the deposition of supervisory class member Yasa, Capstone attorney Daniel Jonathan caused Yasa to confess to "cheat[ing] the company by having taken meals on the clock in addition to taking unpaid meal breaks."  According to WCQ, this exchange illustrated direct adversity as described in comment 1 to Rule 1.7 of the Rules of Professional Conduct of the State Bar of California (Rule 1.7), which states that "direct adversity can arise when a lawyer cross-examines a non-party witness who is the lawyer's client in another matter, if the examination is likely to harm or embarrass the witness."  We are not persuaded.

13

The Yasa deposition transcript reflects that Jonathan asked Yasa if he knew why his time records showed untimely meal breaks, and Yasa responded by acknowledging certain irregularities in his meal and rest break practices on the occasions he "forgot to clock out" for his first break.[6] We cannot agree that counsel's attempt to seek clarification regarding a class member's timesheets was an examination "likely to harm or embarrass" him for purposes of Rule 1.7, even if those attempts at clarification led to an unexpected response. Though WCQ insists that class counsel "forc[ed]" Yasa "to disclose his confidential information as to his taking meal breaks on the clock," WCQ makes no attempt to explain how this information was "confidential," let alone acknowledge Yasa's subsequent testimony that "management" was already aware he had taken meal periods inconsistent with company policy and simply told him to "just fix . . . the discrepancy."

In any event, WCQ fails to persuade us that Capstone will likely have to examine Yasa at trial along these lines in order to prove WCQ's liability for wage and hour violations based on its company-wide policies and practices.

---

[6]    Yasa's testimony on this score was not entirely clear. In the proceedings below, Mendoza argued that Yasa did not, as WCQ suggested, confess to taking "multiple meal periods" or " 'stealing' from the company." Rather, according to Mendoza, "[w]hat the deposition transcript reveals, as clarified by [WCQ's] counsel on multiple occasions, is that Mr. Yasa ate his food during the paid rest breaks, and then later took unpaid meal breaks, confusing the term 'meal' break with the legal definition and the time when the employees actually ate food." The record on appeal does not contain all relevant portions of Yasa's deposition transcript, including those occasions in which WCQ's counsel purportedly clarified what Yasa meant. On this partial record, we may reasonably assume the trial court impliedly accepted Mendoza's characterization of Yasa's testimony. (See *Hernandez v. California Hospital Medical Center* (2000) 78 Cal.App.4th 498, 502 [failure to provide adequate record on issue generally requires that issue to be resolved against appellant].)

14

Yasa did not suggest his personal meal and rest break practices were widespread at the company. To the contrary, he insisted the employees he supervised "always" clocked out and clocked back in, though he himself "would forget" and then "make it up later."

WCQ next complains the trial court "entirely ignored" WCQ's argument that a judgment in this case may not have preclusive effect on absent class members due to Capstone's purported conflict of interest. (See *Cal Pak Delivery, Inc. v. United Parcel Service, Inc.* (1997) 52 Cal.App.4th 1, 12 (*Cal Pak*) [where there is reason to doubt loyalty of counsel, "serious questions arise concerning the preclusive effect of any resulting judgment"].) As part of this argument, WCQ accuses Capstone of failing to "vigorously and tenaciously" prosecute the action on behalf of the class because Capstone has not sued the supervisory class members as "person[s] acting on behalf of an employer" under section 558.1. We remain unconvinced. The trial court found, based on substantial evidence, that Capstone did not have a disqualifying conflict of interest in representing both supervisory and nonsupervisory class members. Consequently, we may reasonably assume the court impliedly rejected WCQ's concerns about any future judgment being denied preclusive effect under the rationale of *Cal Pak*.

WCQ's reliance on section 558.1 fares no better. This statute provides in relevant part that "any employer or other person acting on behalf of an employer" may be liable as the employer for wage and hour violations. (§ 558.1, subd. (a).) "[T]he term 'other person acting on behalf of an employer' is limited to a natural person who is an owner, director, officer, or managing agent of the employer." (*Id.*, subd. (b).) Managing agents are "employees who exercise substantial independent authority and judgment in their corporate decision making so that their decisions ultimately determine corporate

15

policy"; they are "more than . . . mere supervisory employee[s]." (*White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 566–567, 573.)

At best, the evidence in this case was disputed as to whether the supervisory class members exercised the requisite level of independent authority and judgment to constitute persons acting on behalf of WCQ for section 558.1 purposes. As such, we defer to the trial court's relevant factual findings that these nonexempt supervisory employees did not create the uniform break policies that form the basis for liability in this case, and that they had no "role in setting company policy." Thus, on this record, section 558.1 provides no basis for concluding that Capstone was required to sue these supervisory employees in order to adequately prosecute the claims on behalf of the class.

Finally, WCQ argues Capstone must be disqualified because its continuing representation of supervisory and nonsupervisory class members will have a "substantial continuing effect" on future proceedings. For example, WCQ argues that supervisory class members like Yasa and Presa may refuse to cooperate with Capstone going forward, and that WCQ will not be able to communicate internally with the supervisory class members now that they are now part of a certified class.

We find WCQ's reliance on the "substantial continuing effect" rationale to be misguided. In *City of San Diego v. Superior Court* (2018) 30 Cal.App.5th 457, the court explained that because disqualification of counsel is a prophylactic remedy, it is not appropriate to disqualify an attorney as punishment for a "dereliction that will likely have no substantial continuing effect on future judicial proceedings"; conversely, disqualification is appropriate where there is a " 'reasonable probability' or 'genuine likelihood' " that an attorney's status or misconduct will " 'affect the outcome of the

16

proceedings before the court' " (e.g., the attorney previously obtained confidential information from a client who is now on the other side in litigation). (*Id.* at pp. 471–473.) Here, the record does not reflect Capstone's commission of any misconduct or dereliction for which the court must consider the likelihood of substantial continuing effects on future judicial proceedings. Moreover, WCQ has not meaningfully briefed how any future refusal of individual supervisory class members to cooperate with Capstone will affect the merits of this action or why WCQ would be barred from communicating internally with the supervisory class members regarding their ongoing job responsibilities with the company.

### DISPOSITION

The order denying WCQ's renewed motion to disqualify class counsel is affirmed. Mendoza is entitled to his costs on appeal.

_____
Fujisaki, Acting P.J.

WE CONCUR:

_____
Rodríguez, J.

_____
Burns, J. *

*Mendoza v. West Coast Quartz Corporation* (A170409)

---

\* Associate Justice of the Court of Appeal, First Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.